# EXHIBIT A

File no. 86/299/2003 (Number in old format 12486/2003)

ROMANIA

DISTRICT COURT DISTRICT 1 BUCHAREST
Criminal Sentence no. 1071
Public meeting of 19 April 2007
Panel of judges composed of:
PRESIDENT – BIVOLARU ȘTEFANIA
COURT CLERK – SIGMUND NICOLETA

*[Applied seal: BANCO TURCA-ROMANA S.A.*
*Entry/exit, No. 1215*
*DATE: 25 July 2007]*

The Public Ministry was represented by prosecutor Lupu Florentina from the Prosecutor's Office attached to District Court District 1 Bucharest.

Pending before the court is the pronouncement of criminal case regarding the defendants DUMITRESCU CRISTIAN, KAMURAN CORTUK, ERCELIK MUSTAFA KEMAL, TOBUR MEHMET FAHIM, TULGAR KORAY, YALCINKAYA CETIN FIGEN, YURUKOGLU LEVENT HUSEIN, KONCAVAR MURAT, KAMURAN CORTUK, YALCINKAYA CETIN FIGEN, YURUKOGLU LEVENT HUSEIN, ERCELIK MUSTAFA KEMAL, TULGAR KORAY and the civil Parties BANCO TURCA ROMANA S.A. and BANCO TURCA ROMANA S.A. THROUGH THE LIQUIDATOR BANK DEPOSIT GUARANTEE FUND as LIQUIDATOR, having as its object the intellectual forgery (article 289 Criminal Code) article 248 Criminal Code.

The arguments on the merits were noted in the meeting resolution of 11 April 2007, part of this document, when the Court, who needs time to deliberate and for written notes to be submitted, postponed the pronouncement to 19 April 2007, the day when it pronounced this criminal sentence:

THE COURT

By the indictment of Prosecutor's Office attached to High Court of Cassation and Justice on 1 October 2003 ordered the initiation of criminal action and sent to trial the defendants Kamuran Cortuk regarding the criminal offences set out by article 25 Criminal Code related to article 248-248[1] Criminal Code, with the application of article 75(1)(a) Criminal Code and article 31(2) Criminal Code related to article 40 of Law no. 82/1991, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code; Ercelik Mustafa Kemal regarding article 31(2) Criminal Code related to article 40 of Law no. 82/1991 related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1) letter "a" Criminal Code; Koncavar Murat regarding article 248-248[1] Criminal Code, with application of article 75(1)(a) of Criminal Code and article 31(2) Criminal Code related to article 40 of Law no. 82/1991 related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code; Tobur Mehmet Fahim

1

regarding article 31(2) Criminal Code related to article 40 of Law no. 82/1991, related to article 289 Criminal Code,  with application of article 41(2) Criminal Code and article 75(1) (a) Criminal Code; Tulgar Koray regarding article 31(2) Criminal Code related to article 40 of Law no. 82/1991, related to article 289 Criminal Code,  with application of article 41(2) Criminal Code and article 75(1) (a) Criminal Code; Yalcinkaya Cetin Figen regarding article 248-248[1] Criminal Code, with the application of article 75(1)(a) Criminal Code and article 31(2) Criminal Code related to article 40 of Law no. 82/1991, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code; Yurukoglu Levant Husein regarding article 248-248[1] Criminal Code, with the application of article 75(1)(a) Criminal Code and article 31(2) Criminal Code related to article 40 of Law no. 82/1991, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code and article 265 point 2 of Law 31/1990 with application of the article 41(2) of the Criminal Code; Dumitrescu Cristian regarding article 248-248[1] Criminal Code, with the application of article 75(1)(a) Criminal Code and article 31(2) Criminal Code related to article 40 of Law no. 82/1991, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1) (a) Criminal Code.

It was held that during the period 3 February 1998 – 27 October 2000, at the request of defendant Kamuran Cortuk, president of the Company Bayindir Insaat Turizm Ticaret ve Sanayi A.S. Turkey and member of the Board of Directors of Banco Turca Romana S.A., the management of Banco Turca Romana S.A. (respectively the defendants Yurukoglu Levent Husein, Tobur Fahim Mehmet – former presidents; Tulgar Koray, Ercelik Mustafa Kemal, Koncavar Murat, Dumitrescu Cristian and Yalcinkaya Cetin Figen, all former vice-presidents) created and extended placements in foreign currency with the initial characteristics of time deposits without bringing to the knowledge of Board of Directors in a number of four foreign partner banks and based on guarantee or loan contracts they turned these deposits into a collateral deposits for securing loan facilities granted by these banks to the Bayindir Holding Group.

In the criminal prosecution stage they produced as means of evidence the declarations of witnesses, letters, mentions and documents submitted by the civil Party, documents issued by the National Bank of Romania, declarations given by defendants, communications from banking institutions, and accounting expertise.

By ordinances 00069 of 10 May 2001 the distraint was placed upon the assets of defendants up to the limit of the amount of 48,781,104.33 USD.

At the 2 February 2005 Court term the defendant Levent Huseyin Yurukoglu by defender raised the exception of unconstitutionality on provisions of article 178(2[1]) Criminal Procedural Code, and the Court by meeting resolution of 6 April 2005, by virtue of article 303(6) Criminal Procedural Code ordered the suspension of the case until the settlement of the exception of unconstitutionality by the Constitutional Court.

By decision no. 540 of 18 October 2005 the Constitutional Court rejected the exception of unconstitutionality as inadmissible.

In the case the defendant Dumitrescu Cristian was heard (page 80, vol. III) who showed that he was not guilty of committing the criminal offences he was accused of, that he was informed by the other

shareholders that they would pledge some deposits of the bank in favour of other banks and although initially he did not agree, later, as it was made clear to him that this operation would take place for a short period of time, he signed a contract by which he pledged a deposit of the bank for securing a loan which an Austrian bank would give to Bayindir Group. He also stated that for none of the deposits for which he signed, the civil party did not record any prejudice. He also said that indeed these deposits were of collateral nature used for securing loans, but they were not executed by the depository banks. As for the criminal offence of intellectual forgery, he showed that according to the BTR organization chart he did not have assignments to report to NBR the financial situation of the bank, but sometimes he signed such reports as a result of absence of the president or vice-president of the bank. When the bank collapsed, he learned that 110 million dollars out of 150 million dollars, he knew as liquid assets were pledged in favour of the main shareholder, Bayindir Group. In the reports he signed, the deposits were listed as common, without any encumbrances.

<u>The prejudiced party, through the liquidator Bank Deposit Guarantee Fund, by virtue of article 14 related to article 346 Criminal Procedural Code stands as the offended party in the criminal proceedings for the amount of 59,421,921.04 USD and 11,326,199.99 EUR with legal interest calculated from the date of 31 March 2003 until the full payment of the debt is made.</u>

In the judicial inquiry stage the following witnesses were heard: Osman Sena f106, Gheorghe Bogdan, f108, Dobre Carmen, f137, Cioflan Aristide, f139, Şerban Remus Luigi, f162, Şerban Anca, f164, Vinulescu Constantin, f244, Vâlvoi Mocanu Constantin, f335, VOL. III.

By analysing the acts and works of the file in the light of statements of the Parties and the means of evidence produced in the case the court holds as follows:

*De facto,* on 12 February 2001, the Supervisory Division within the National Bank of Romania notified the General Police Inspectorate that Banco Turca Romana S.A. was committed over the exposure limit set out by the norms of National Bank of Romania by signing security/financing contracts of loans given by/through external correspondent banks with Turkish capital from Netherlands, Vienna, Geneva, Malta, Bahrain and Northern Cyprus, to Bayindir Group, the majority shareholder of the bank. (vol. 1 DUP – pages 41-42).

Moreover, by not submitting those contracts to Banco Turca Romana S.A. and by issuing documents for placement/extension of deposits as time deposits and not as collateral deposits or loan, they sought to hide the real economic content of those operations, drawing up fictitious financial statements (balance sheet, reports to N.B.R.). For the loan or financing commitments given in favour of Bayindir Group they did not create securities and did not charge commissions. As a result of non-repayment of loans by Bayindir Group and the impossibility to execute guarantees (because of their non-existence), the deposits placed at Dinamic Bank of Cyprus in the amount of 19.9 million USD and 8.8 million EUR were executed by that bank.

In the same situation was the fiduciary loan given by Banque Francaise de L'Orient Geneva in the amount of 30.8 million USD at the final due date of 1 February 2001, the fiduciary loan was not repaid.

From the documents held by National Bank of Romania it resulted that the signature by which Banco Turca Romana S.A. was engaged in the mentioned transactions were given by: Yurukoglu Levent

Husein, former president; Mehmet Fahim Tobur, former president; Koray Tulgar, former vice-president; Mustafa Kemal Ercelik, former vice-president; Murat Koncavar, former vice-president; Cristian Dumitrescu, vice-president; Figen Yalcinkaya Cetin, vice-president and this situation was known by Kamuran Cortuk, president of Bayindir Holding A.S. who in this capacity knew that Bayindir Group was the beneficiary of those amounts and in his capacity as member of the Board of Directors of Banco Turca Romana S.A. approved a fictitious, false balance sheet.

The notification of the National Bank of Romania was based on the report drawn up by the Supervisory Division regarding the financial and prudential situation of Banco Turca Romana S.A. on 31 January 2001 (vol. 1 – pages 43-57) by which it proposed both the opening of bankruptcy proceedings and the withdrawal of the operating licence of Banco Turca Romana S.A.

According to the article 13 of the Articles of Association of B.T.R. the Board of Directors was responsible to draw up the balance sheet and profit and loss account and to propose to the General Meeting of Shareholders the destination of profit (letter a); to propose to the General Meeting of Shareholders the income and expenses budget for the next fiscal year (letter b); establishes the policy of the Bank regarding resources, loans and interests (letter k); approves the income and expenses of the Bank, own investments (…) (letter l); decides on the creation of guarantees over the assets of the BANK in the limit admitted by the law and these Articles of Association (letter x).

Also, in article 15 it stipulated that "The President commits the BANK according to tasks, responsibilities and powers of attorney established by the Board of Directors of the Bank" and "the assignments and competences of vice-presidents are established by the Board of Directors of the bank, at the proposal of the President of the Bank."

In article 16 it is specified that "the activities carried out by the bank will create legal obligations only if they bear the signature of at least two managers whose position will be specified in the list of authorized signatures approved by the Steering Committee."

The provisions of article 12 of the Articles of Association provide that "for the validity of decisions of Board of Directors the presence of at least half of the number of directors is necessary and the decisions of the Board of Directors are made with the absolute majority of the present members" and the "members of Board of Directors are responsible according to the law for the fulfilment of all their obligations, as mentioned in the mandate they hold." Vol. 3 DUP pages 332-334.

On 22 December 1993, BTR was registered in the Trade Register Office of Bucharest Municipality, under number J/40/28153/1993 (vol. 3 – page 299) and in August 2000, on the territory of Romania, BTR had 18 subsidiaries.

Its shareholders were formed of one natural person and four legal persons, of the latter Bayindir Holding A.S. standing out with a contribution to share capital of 219,456,000,000 lei (out of 345,600,000,000 lei), a number of shares 219,456,000 (out of total 345,600,000) and the participation of benefits to losses of 63.5000% (vol. 3 – page 310).

The object of activity of BTR included the provision of commercial banking services and investments to natural and legal persons, collection of deposits in lei and foreign currency,

4

awarding of short-term, medium and long term loans and performance of any banking operations associated with import-export operations: issue and management of payment and loan instruments; payments and deductions; transfers of funds; issue of letters of bank guarantee; confirmation of letters of bank guarantee; sale or purchase of cheques issued by BTR or another foreign bank, banking consultancy (vol. 2- pages 342-343).

On 8 January 1997, at the Extraordinary General Meeting of BTR Shareholders, Yurukoglu Levent Husein was appointed president of the Board of Directors and executive president of B.T.R. (vol. 3 – page 322). On 4 March 1997, at the Extraordinary General Meeting of BTR Shareholders, the defendant Koncavar Murat was appointed vice-president of the Board of Directors and executive vice-president of B.T.R. S.A. (vol. 3 – page 321). On 8 April 1997 at the main BTR office the General Meeting of Shareholders took place with the following agenda: the change of composition of BTR Board of Directors (vol. 3 - page 312). Thus, the number of members of the Board of Directors changed from 7 to 9 members, and the new structure included the defendants Yurukoglu Levent Husein (president), Dumitrescu Cristian, Koncavar Murat and Yalcinkaya Cetin Figen, vice-presidents.

On 3 May 2000, in the Ordinary General Meeting of BTR Shareholders the appointment of defendant Tobur Fahim Mehmet in the positions of B.T.R. president and president of Board of Directors of the Bank was approved. Also, the appointment of defendant Tulgar Koray in the positions of vice-president of B.T.R. and vice-president of the Board of Directors of the Bank (vol. 1 DUP1 – page 294-295) was approved. On 20 June 2000 in the Ordinary General Meeting of BTR Shareholders defendant Ercelik Mustafa Kemal was named to the positions of vice-president of the Board of Directors and executive vice-president of B.T.R.

During the period 3 February 1998 – 27 October 2000 the BTR management created and later extended, without informing the Bank, placements in foreign currency, in four foreign partner banks, which although initially had the destination of time deposits, later, based on guarantee or loan contracts their destination changed, becoming collateral deposits for securing loan facilities given to Bayindir Holding Group, whose president was the defendant Kamuran Cortuk, member of the BTR Board of Directors. Also, these deposits, although had to be recorded in 1313 and 901 accounts (as collateral deposits or commitments in other banks) were fictitiously recorded in the 1312 account, as time deposits. They were also incorrectly reported to NBR because otherwise, they would have noted that they violated the norms regarding the prudential indicators, which had to be regularly calculated and reported to NBR. The foreign banks in which placements in foreign currency were made and value of collateral deposits created are shown in the expert accounting report (vol. 2 DUP – pages 92-93).

As a result of the actions undertaken at the foreign banks in which these placements were made (Es Bank Ag Vienna Finansbank Holland Suisse, Banque Francaise de L'Orient, Demirbank), f180-182, vol.1, the real legal nature of each deposit was shown as follows: Finansbank Holland Suisse communicated that the amount of 10 million dollars was used as collateral deposit, according to the BTR instructions; Demirbank communicated that the deposits of 35 million dollars and 8.8 million EUR were transferred to Dinamic Bank of Cyprus, which in turn made it clear that they were collateral deposits.

Even if the procedure for these placements, which created guarantees or loans, was to create security interests and to pay commissions, the Bayindir Group was not required to fulfil those guarantees for the purpose of making the real nature of those amounts and their identity undetectable. Thus, on page 43 vol. 1 can be found the 31 January 2001 report with the financial and prudential statement of BTR, prepared by NBR, report which shows that after verifying "it was noted that BTR did not request the creation of guarantees for the commitments given and did not charge commissions for these commitments, with the goal of preventing their identification as collateral deposits and in order to mislead about the real nature of these amounts".

According to the same report stated above, BTR calculated and transmitted to NBR an fictitious level of equity and thus, it misrepresented the content of banking prudence reports by violating the provisions of article 69 L 58/1998. On 31 December 2000 all the banking prudence indicators calculated based on the bank's funds were outside of the regulated limits, and became irrelevant. As a result of its liquid assets crisis BTR was not able to fulfil the obligations established by NBR in Regulation no. 4/1998, respectively the creation of a minimum compulsory reserve at the set level. As a result of the same crisis, BTR recorded situations in which the debt instruments were not fully paid within at least 30 days from the debiting date of customer's account. It was concluded that on 31 January 2001 *[Potentially the year could be 2000? See first line of the paragraph]* BTR classified, according to the provisions of article 2(1)(a) of Law no. 83/1998 for banking bankruptcy proceedings "a bank is considered insolvent if........it did not fully pay certain, liquid and exigible receivables within at least 30 days".

The consequence was to propose the opening of bankruptcy proceedings against BTR and withdrawal of its licence, completed with the initiation of this procedure.

Therefore, given the previous reasons, the Court holds that although at BTR there were no internal regulations regarding the possibility of creation of collateral deposits in other banks from abroad, such placements were made without any written request from Bayindir Group accompanied by documentation required by such banking norms, without these placements being discussed in the Board of Directors and proven as such and without issuing letters of bank guarantee. As for the contracts signed the Court holds as follows:

Thus, during the period 23 June 1999 – 26 July 1999, the defendants Yurukoglu Levent Husein and Koncavar Murat, president and vice-president of BTR respectively, signed and transmitted to the Malta and Bahrain Branches of Demirbank, 14 contracts of commitment (vol. 2 – pages 112-131; 133-136; 138-139).

As a result of the content of those 14 contracts, given the loan facility given to Bayindir Insaat Turizm Ticaret Ve Sanay A.S., effective the date of use until the final due date, BTR accepted irrevocably and unconditionally that its investments on the monetary market to these branches created valid guarantees for the period of the loan facility to Bayindir Insaat Turizm Ticaret Ve Sanay A.S.

According to this facility, BTR also committed to pay six months interest amounts owed to these banks, if they remained unpaid by Bayindir Insaat Turizm Ticaret Ve Sanay A.S. At the final due date of the loan facility, if the principal amount is not paid with the accrued interest, BTR authorized these banks to liquidate the account from its investment on the monetary market. The interest was going to accrue monthly.

In practice, the difference in content between the 14 commitment contracts was the value of the guarantee created (value of deposit), the deadlines and interest charged for the loan given. The total amounts of BTR guarantees for the loan facilities given by Demirbank to Bayindir Insaat Turizm Ticaret Ve Sanay A.S. company were 34,950,000 USD, of which 12,000,000 USD to the Malta Branch and 22,950,000 USD to the Bahrain Branch; 6,800,000 EUR to the Malta Branch; 4,000,000 DEM to the Malta Branch.

I.    On 23 June 1999, the defendants Yurukoglu Levent Husein and Koncavar Murat signed and transmitted to the Bahrain Branch of Demirbank the commitment contract regarding the loan facility of 4 million USD given to Bayindir Group for a period of one year and one week, effective the date of use until the final due date of 4 July 2000, when the foreign bank was authorized to liquidate the account from the investment on the monetary market, with the value of the loan not repaid with the accrued interest (vol. 2 DUP – pages 107-108).

The time deposit in the amount of 4,000,000 USD created in this bank for the period 24 June – 26 July 1999 and recorded in the BTR accounting system in account 1312 as time deposit in banks", with NC DY 28 – SLIP 26546 of 24 June 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 26 July 1999, created as a guarantee, according to the commitment contract of 23 June 1999 for the loan facility given by Demirbank for Bayindir.

II.   On 24 June 1999, the defendants Yurukoglu Levent Husein and Koncavar Murat signed and transmitted to the Bahrain Branch of Demirbank the commitment contract regarding the loan facility for the amount of 5,000,000 USD given to the company Bayindir for a period of one year and one week, effective the date of use until the final due date of [illegibile day] July 2000 (vol. 2 DUP – pages 112-113), by which the foreign bank was authorized to liquidate the account from investment on the monetary market, with the value of the loan not repaid with the accrued interest. The time deposit in the amount of 5,000,000 USD created at this bank for the period 23 June 1999 – 23 July 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 29 – SLIP 26502 of 23 June 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective the date of 23 July 1999, created as a guarantee according to the commitment contract of 24 June 1229 [SIC] for the loan facility given by Demirbank to the company Bayindir.

III.  On 30 June 1999 the same defendants signed and transmitted to the Malta Branch the commitment contract regarding the loan facility of 5 million USD given to Bayindir Group for one year and one week, effective the date of use until the final due date, 7 July 2000 (vol. 2 DUP – pages 114-115), by which it was authorized to liquidate the account from investment on the monetary market with the value of the loan not repaid by Bayindir with accrued interest.

The time deposit in the amount of 5,000,000 USD created in Demirbank for the period 29 June 1999 – 29 July 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 26/SLIP 2666 of 29 June 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 31 July 1999, created as a guarantee according to the commitment contract of 30 June 1999 for the loan facility given by Demirbank to Bayindir Company.

7

IV.    On <u>8 July 1999,</u> the same defendants signed and transmitted to the Bahrain Branch of Demirbank a commitment contract regarding the loan facility of 1,000,000 USD given to Bayindir Company for one year and one week, effective the date of use until the final due date of 17 July 2000 (vol. 2 DUP – pages 116-117), the foreign bank was authorized to liquidate the investment account on the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

    The time deposit in the amount of 1,000,000 USD created in Demirbank for the period 7 July 1999 – 12 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 26/SLIP 26936 of 7 July 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 11 August 1999, created as a guarantee according to the commitment contract of 8 July 1999 for the loan facility given by Demirbank to Bayindir Company.

V.    On <u>19 July 1999,</u> the defendants Yurukoglu Levent Husein and Koncavar Murat signed and transmitted to the Bahrain Branch of Demirbank a commitment contract regarding the loan facility of 3,000,000 USD given to Bayindir Company for one year and one week, effective the date of use until the final due date of 27 July 2000 (vol. 2 DUP – pages 118-119), the foreign bank was authorized to liquidate the investment account on the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

    The time deposit in the amount of 3,000,000 USD created in Demirbank for the period 16 July 1999 – 19 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 29/SLIP 27302 of 16 July 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 19 August 1999, created as a guarantee according to the commitment contract of 19 July 1999 for the loan facility given by Demirbank to Bayindir Company.

VI.    On <u>21 July 1999,</u> the defendants Yurukoglu Levent Husein and Koncavar Murat signed and transmitted to the Bahrain Branch of Demirbank a commitment contract regarding the loan facility of 4,000,000 USD given to Bayindir Company for one year and one week, effective the date of use until the final due date of 3 August 2000 (vol. 2 DUP – pages 120-121), the foreign bank was authorized to liquidate the investment account on the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

    The time deposit in the amount of 4,000,000 USD created in Demirbank for the period 20 July 1999 - 20 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 117/SLIP 27414 of 20 July 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 20 August 1999, created as a guarantee according to the commitment contract of 21 July 1999 for the loan facility given by Demirbank to Bayindir Company.

VII.    On <u>2 July 1999,</u> the defendants Yurukoglu Levent Husein and Koncavar Murat signed and transmitted to the Malta Branch of Demirbank a commitment contract regarding the loan facility of 2 million USD given to Bayindir Company for one year and one week, effective the date of use until the final due date of 10 July 2000 (vol. 2 DUP – pages 122-123), the foreign bank was authorized to liquidate the investment account on the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

The time deposit in the amount of 2,000,000 USD created in Demirbank for the period 1 July 1999 – 2 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 30/SLIP 26782 of 1 July 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 2 August 1999, created as a guarantee according to the commitment contract of 7 July 1999 for the loan facility given by Demirbank to Bayindir Company.

VIII.    On 29 June 1999, the same defendants signed and transmitted to the Malta Branch of Demirbank a commitment contract regarding the loan facility of 5 million USD given to Bayindir Company for one year and one week, effective the date of use until the final due date of 6 July 2000 (vol. 2 DUP – pages 124-125), the foreign bank was authorized to liquidate the investment account on the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

The time deposit in the amount of 5,000,000 USD created in Demirbank for the period 28 June 1999 – 28 July 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 30/SLIP 26638 of 28 June 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 28 July 1999, created as a guarantee according to the commitment contract of 29 June 1999 for the loan facility given by Demirbank to Bayindir Company.

IX.    On 9 July 1999, the same defendants signed and transmitted to the Malta Branch of Demirbank a commitment contract regarding the loan facility of 2,150,000 USD given by it to Bayindir Company for one year and one week, effective the date of use until the final due date of 18 July 2000 (vol. 2 DUP – pages 126-127), when the foreign bank was authorized to liquidate the investment account on the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

The time deposit in the amount of 2,150,000 USD created in DEMIRBANK for the period 8 July 1999 – 12 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 22/SLIP 26988 of 8 July 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 12 August 1999, created as a guarantee according to the commitment contract of 9 July 1999 for the loan facility given by Demirbank to Bayindir Company.

X.    On 15 July 1999, the two defendants signed and transmitted to the Malta Branch of Demirbank a commitment contract regarding the loan facility of 3,800,000 USD given to Bayindir Company for one year and one week, effective the date of use until the final due date of 24 July 2000 (vol. 2 DUP – pages 128-129), when the foreign bank was authorized to liquidate the investment account on the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

The time deposit in the amount of 3,800,000 USD created in Demirbank for the period 14 July 1999 – 16 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with NC DY 33/SLIP 27199 of 14 July 1999 (vol. 2 DUP – page 110) was turned into a collateral deposit effective 16 August 1999, created as a guarantee according to the commitment contract of 5 July 1999 for the loan facility given by Demirbank to Bayindir Company.

XI.    On 19 July 1999, the two defendants signed and transmitted to the Malta Branch of Demirbank a commitment contract regarding the loan facility of 3,300,000 EUR given to Bayindir Company

9

for one year and one week, effective the date of use until the final due date of 26 July 2000 (vol. 2
DUP – pages 130-131), when the foreign bank was authorized to liquidate the investment account
on the monetary market with the value of the loan not repaid by Bayindir with the accrued
interest.

The time deposit in the amount of 3,300,000 EUR created in Demirbank for the period 6 July
1999 – 16 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in
banks" with NC DY 2/SLIP 27253 of 16 July 1999 (vol. 2 – page 132) was turned into a collateral deposit
effective 17 July 1999, created as a guarantee according to the commitment contract of 19 *[July/June
month illegible]* 1999 for the loan facility given by Demirbank to Bayindir Company.

XII.   On 21 July 1999, the same defendants signed and transmitted to the Malta Branch of Demirbank
       a commitment contract regarding the loan facility of 500,000 EUR given to Bayindir Company
       for one year and one week, effective the date of use until the final due date of 1 August 2000 (vol.
       2 – pages 133-134), when the foreign bank was authorized to liquidate the investment account on
       the monetary market with the value of the loan not repaid by Bayindir with the accrued interest.

The time deposit in the amount of 500,000 EUR created in Demirbank for the period 19 July
1999 – 18 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in
banks" with NC DY 2/SLIP 27308 of 19 July 1999 (vol. 2 – page 132) was turned into a collateral deposit
effective 18 August 1999, created as a guarantee according to the commitment contract of 21 July 1999
for the loan facility given by Demirbank to Bayindir Company.

XIII.   On 21 July 1999, the defendants signed and transmitted to the Malta Branch of Demirbank a
        commitment contract regarding the loan facility of 4 million DEM given by it to Bayindir
        Company for one year and one week, effective the date of use until the final due date of 2 August
        2000 (vol. 2 – pages 135-136), when the foreign bank was authorized to liquidate the investment
        account on the monetary market with the value of the loan not repaid by Bayindir with the
        accrued interest.

The time deposit in the amount of 4,000,000 DEM created in Demirbank for the period 19 July
1999 – 18 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in
banks" with NC DY /SLIP 27305 of 19 July 1999 (vol. 2 – page 132) was turned into a collateral deposit
effective 18 August *[Year unknown; no digits after 1 in the source text]*, created as a guarantee according
to the commitment contract of 21 July 1999 for the loan facility given by Demirbank to Bayindir
Company.

XIV.   On 19 July 1999, the defendants Yurukoglu Levent Husein and Koncavar Murat signed and
       transmitted to the Malta Branch of Demirbank a commitment contract regarding the loan facility
       of 3 million EUR given to Bayindir Company for one year and one week, effective the date of use
       until the final due date of 3 August 2000 (vol. 2 – pages 138-139), when the foreign bank was
       authorized to liquidate the investment account on the monetary market with the value of the loan
       not repaid by Bayindir with the accrued interest.

The time deposit in the amount of 3,000,000 EUR created in Demirbank for the period 26 July
1999 – 26 August 1999 and recorded in the accounting system of BTR in account 1312 "Time deposits in

banks" with NC DY 2/SLIP 27570 of 26 July 1999 (vol. 2 – page 132) was turned into a collateral deposit
effective 17 August 1999, created as a guarantee according to the commitment contract of 19 July 1999
for the loan facility given by Demirbank to Bayindir Company. The transfer was made based on the
pledging contract in the amount of 22,000,000 USD (vol. 2 – pages 197-198) signed with this bank on 4
September 2000 by the leaders of BTR Tobur Mehmet Fahim – president and Tulgar Koray – vice-
president.

By transferring the rights over the guarantee, in the amount of 22,000,000 USD to Dinamic Bank,
no risk or additional prejudice was created, considering the irrevocable and unconditional nature of
guarantees created effective July 1999 on the BTR deposits from Demirbank, the execution of deposits by
Demirbank was temporarily avoided.

Based on SLIP deal no. 44519 and accounting note no. DY 6 of 4 October 2000 (vol. 2 – pages
199-200), the amount of 22,000,000 USD was transferred from Demirbank and placed in Dinamic Bank
for the period 4 October 2000 – 6 November 2000, with interest of 12%, which equals 242,000 USD.

Dinamic Bank confirmed by telex the value of the deposit, the period and interest percentage
(vol. 2 – page 201). The placements presented in points VII-X in total the amount of 12,950,000 USD
represent guarantees for the loan facilities in the amount of 7,000,000 USD given by Demirbank, Bahrain
Branch and in the amount of 5,950,000 USD by Demirbank Malta Branch,to Bayindir Company, were
fully transferred to Dinamic Bank Offshore LTD Lefkosa.

The transfer, in the amount of 13,000,000 USD was made based on the (commitment) pledging
contract signed by this bank on 29 September 2000 by the leaders of BTR, Tobur Mehmet Fahim and
Ercelik Mustafa Kemal.

Because the final due date of the 4 guarantee contracts, signed by Yurukoglu Levent Husein –
president and Koncavar Murat – vice-president, had been fulfilled effective July 2000, and the loans used
by Bayindir had not been repaid, Demirbank was going to proceed to the execution of these guarantees,
the pledges being irrevocable and unconditional.

Under these conditions, BTR's alternative to prevent Demirbank's execution, was to extend the
due dates of guarantees for a short period, so that Demirbank did not execute the guarantees, which
offered Bayindir Group the time necessary for the payment of the loan. Therefore, the guarantee contracts
which had matured were transferred for the benefit of Dinamic Bank by the conclusion of the pledging
commitment signed by the bank management on 29 September 2000.

In the content of commitment document in the amount of 13,000,000 USD (vol. 2 – page 202) by
which the due dates of guarantee contracts were extended, a reference is made to the object of guarantee
and the value of initial contracts. By transferring the rights over the guarantee in the amount of
13,000,000 USD to Dinamic Bank, no risk or additional prejudice was created, considering the
irrevocable and unconditional nature of guarantees created effective June and July 1999 on BTR deposits
from Demirbank, the execution upon deposits by the creditor bank was temporarily avoided.

Based on the SLIP deal no. 45427 and accounting note no. DY 12 of 31 October 2000 (vol. 2 –
pages 203-204) the amount of 13,000,000 USD was transferred from Demirbank and placed in Dinamic
Bank for the period 30 October 2000 – 30 November 2000, with interest of 12% which equaled

134,333.33 USD. Dinamic Bank confirmed by telex the value of deposit, the period and the interest percentage (vol. 2 – page 205). The placements presented at points XI-XIII, in total amount of 3,800,000 EUR and 4,000,000 DEM, created as a guarantee for the loan facilities given by Demirbank, Malta Branch to Bayindir were fully transferred to Dinamic Bank Lefkosa.

The transfer, in the amount of 5,800,000 EUR was made based on the commitment contract (vol. 2 – page 206) signed with the bank on 29 September 2200 *[SIC; year incorrect in the source text]* by the leaders of BTR, Tobur Mehmet Fahim – president and Tulgar Koray – vice-president.

Because the final due date of the 3 guarantee contracts, signed by Yurukoglu Levent Husein – president and Koncavar Murat – vice-president, had occurred at the end of July 2000 and the loans used by Bayindir had not been repaid, Demirbank was about to proceed to execution on these guarantees, as the pledges were irrevocable and unconditional.

Under these conditions, BTR's alternative to prevent Demirbank was to extend the due dates of guarantees for a short period, so that Demirbank did not execute the guarantees, which offered Bayindir Group the necessary time for the re-payment of the loan.

Therefore, the existing guarantee contracts which had matured were transferred for the benefit of Dinamic Bank Offshore LTD Lefkosa, by the conclusion of the pledge commitment signed by the bank management on 29 September 2000.

In the content of the commitment document in the amount of 5,800,000 EUR (vol. 2 –page 206) by which the due dates of the guarantee contracts were extended until 30 November 2000, the guarantee and the value of the initial contracts are mentioned.

By transferring the rights over the guarantee in the amount of 5,800,000 EUR to Dinamic Bank, no risk or additional prejudice was created, considering the irrevocable and unconditional nature of the guarantees created effective June and July 1999 on BTR deposits from Demirbank, the execution on deposits by the creditor bank was temporarily avoided.

Based on the SLIP deal no. 45430 and accounting note no. DY 13 of 31 October 2000 (vol. 2 – pages 207-208) the amount of 5,800,000 EUR was transferred from Demirbank and placed in Dinamic Bank for the period 30 October 2000 – 30 November 2000 with interest of 12%, which equals 59,933.33 EUR.

Dinamic Bank confirmed by telex the value of the deposit, the period and the interest percentage (vol. 2 – page 209). The placement presented in point 14, in the total amount of 3,000,000 EUR, created as a guarantee for the loan facility given by Demirbank, Malta Branch, to Bayindir Company was fully transferred to Dinamic Bank Offshore LTD Lefkosa, based on pledge contract (vol. 2 – pages 210-211) signed with the bank on 4 September 2000 by Tobur Mehmet Fahim – president and Tulgar Koray – vice-president.

Because the guarantee contract signed by Yurukoglu Levent Husein – president and Koncavar Murat – vice-president had reached final maturity effective 3 August 2000 and the loans used by Bayindir had not been repaid, Demirbank could not postpone the execution on these guarantees, because the pledges were irrevocable and unconditional.

Under these conditions, BTRR's *[SIC; there is an extra R in the source text that needs to be deleted; I left it in the translation as is in source text]* alternative to prevent Demirbank was to extend the due dates of guarantees for a short period, so that Demirbank did not execute the guarantees, which offered Bayindir Group the necessary time for the re-payment of the loan.

By transferring the rights over the guarantee in the amount of 3,000,000 EUR to Dinamic Bank, no risk or additional prejudice was created, considering the irrevocable and unconditional nature of the guarantee created effective July 1999 on the deposit of Banco Turca Romana from Demirbank, but it temporarily avoided the execution of deposits by the creditor bank.

Based on SLIP deal no. 45434 and accounting note no. DY 14 of October 2000 (vol. 2 – pages 212-213) the amount of 3,000,000 EUR was transferred from Demirbank and placed in Dinamic Bank for the period 4 October 2000 – 3 November 2000, with interest of 12%.

During the period February 1998 – August 1999, BTR made placements in total amount of 14,000,000 USD in Finansbank – Geneva and Amsterdam Branches.

I.    Thus, on 4 February 1998, the defendants Yurukoglu Levent Husein, Dumitrescu Cristian, BTR president and vice-president, respectively, of BTR signed and transmitted to Finansbank Suisse SA Geneva the letter by which they committed irrevocably and accepted to block the amount of 4,000,000 USD placed as a time deposit on 3 February 1998 for securing the loans the bank would give to Bayindir Company (vol. 2 – page 159).

The time deposit in the amount of 4,000,000 USD created in Finansbank and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with accounting note no. DY 24/SLIP no. 12050 of 3 February 1998 became collateral deposit effective 4 February 1998, created as a guarantee for the loan facility given by this bank to Bayindir Group Companies.

II.   On 4 August 1999, the defendants Koncavar Murat and Yalcinkaya Cetin Figen, BTR vice-presidents signed with Finansbank Netherlands NV Amsterdam the legal act called "Pledge title of deposit" (vol. 2 – pages 160-161) regarding the investment on the monetary market, the amount of 700,000 USD for the period 5 August 1999 – 6 September 1999, specifying that this investment would be renewed every month. In this document they stipulated: "We, Banco Turca Romana S.A. irrevocably and unconditionally accept through this document that our investment on the monetary market....will serve as collateral for a loan given by your bank to Bayindir Insaat Turizm Ticaret Ve San. A.S. for the period 6 August 1999 – 10 August 2000.

We agree that Finansbank (Holland) N.V. lends this amount to Bayindir Insaat Turizm Ticaret Ve San. A.S. as working capital.

If Bayindir Insaat Turizm Ticaret Ve San. A.S. does not fulfil its obligations to FINANSBANK (HOLLAND) N.V. according to the loan facilities, FINANSBANK (HOLLAND) N.V. is authorized irrevocably and unconditionally by this document to use our deposit to extinguish, repay the obligations of BAYINDIR INSAAT TURIZM TICARET VE SAN. A.S.

To this contract we will fully apply the general terms and conditions of Dutch Bankers' Association, as they are submitted to the Court of Amsterdam.

13

This contract and the rights and obligations of the Parties from this contract will be drawn up and governed by Dutch laws. Any legal action or procedure to this contract will be brought before the Dutch courts with jurisdiction in Amsterdam."

The time deposit in the amount of 7,000,000 USD created in Finansbank and recorded in the accounting system of BTR in account 1312 "Time deposits in banks" with Accounting Note no. DY 24/SLIP no. 28150 of 4 August 1999 became effective that date, collateral deposit, with title of guarantee for the loan facility given by this bank to Bayindir Company.

III.     On 10 August 1999, the defendants Yurukoglu Levent Husein and Koncavar Murat, president and vice-president of BTR signed with Finansbank Holland NV Amsterdam the contract "Pledge Title of deposit" (vol. 2 – page 162) regarding the investment on the monetary market of the amount of 3,000,000 USD for the period 9 August 1999 – 9 September 1999 and it was stipulated that this investment would be renewed every month, without moving funds for the principal amount.

Also, BTR irrevocably and unconditionally accepted that the investment of 3,000,000 USD served as collateral deposit for the securing of the loan given by Finansbank to Bayindir Company for the period 10 August 1999 – 16 August 2000.

The time deposit was renewed every month for the entire period of the loan given by Finansbank to Bayindir Company with a final due date on 16 August 2000.

The deposit of 3,000,000 USD created in Finansbank on 13 August 1999 and recorded in account 1312 "Time deposits in banks" with accounting note no. DY 27/SLIP no. 28409 of 13 August 1999 was turned into a collateral deposit with title of guarantee for the loan facility given by this bank to Bayindir Company by the document signed on 10 August 1999. The modification of the 3 placements of BTR in FINANSBANK into a collateral deposits was not highlighted in the accounting system as such, in the account 1313 "Collateral deposits in banks" and in the off-balance account 901 "Commitments in favour of other banks".

The accounting entries of BTR did not conform with reality because the employees BTR from the functional departments (Arbitration Division, treasury, back-office, accounting and control) did not know the real destination given by the bank management to the liquid assets placed as time deposits and renewed by SWIFT messages of confirmation and ticket deals (SLIP), because the management did not give these departments the commitment documents of these deposits to Finansbank.

In October 2000 the defendants Tobur Mehmet Fahim, Tulgar Koray, BTR president and respectively, vice-president extended in full the placements in total amount of 14 million USD, which represented guarantees for the loan facilities given by Finansbank to Bayindir Group.

Thus, the defendants signed on 27 October 2000 a Pledge Title of Deposit (vol. 2 – page 215) by which they extended the placements in the amount of 7 million USD and 3 million USD, respectively, created in Finansbank Holland based on the Pledge Titles of Deposits signed on 4 August 1999 and 10 August 1999 (vol. 2 – pages 160-162) by the defendants Yurukoglu Levent Husein and Koncavar Murat.

Because the due date of the 2 pledge titles of deposits had occurred on 10 August 2000 and 16 August 2000 and Bayindir had not repaid the loans, Finansbank Holland was ready to proceed to the execution on the guarantees (deposits), as the pledges were irrevocable and unconditional.

On 25 October 2000, the same defendants extended the placement in the amount of 4 million USD created in Finansbank Switzerland based on the commitment letter signed on 4 February 1998 by the defendants Yurukoglu Levent Husein and Dumitrescu Cristian.

During 1999-2000, BTR signed with Esbank Vienna Agency 7 pledge contracts for the total amount of 24,080,000 USD.

Thus, in August and September 1999, the defendants Yurukoglu Levent Husein, Koncavar Murat, president and vice-president, respectively, signed 5 pledge contracts in the amount of 14,000,000 USD and 6,000,000 EUR. Effective their date of signature the pledge contracts signed with Esbank AC Vienna were highlighted in the accounting system of BTR in account 1312 "Time deposits in banks" with the monthly extension of placements and monthly receipt of interests, which were found every month in the balance of this account from trial balances, to the case file (vol. 2 DUP – page 72). On 4 and 5 May 2000, the defendants Yalcinaya Cetin Figen and Dumitrescu Cristian, BTR vice-presidents signed with Esbank 2 pledge contracts in the amount of 5 million USD (vol. 2 DUP – pages 180-183) by which they secured all the present and future debts which could appear as a result of loans given by Esbank to Bayindir Company by the loan contracts signed. The contracts had the same content and form as the previous pledge contracts signed with Esbank.

Since the signature date, these legal acts were recorded in the accounting of account 1312 "Time deposits in banks" with the monthly extension of placements and monthly receipt of interests, which were found every month in the balance of this account from trial balances enclosed to the case file (vol. 2 DUP – page 72).

The fact that these collateral deposits were not highlighted according to their real legal nature was because the employees of Banco Turca Romana S.A. from the functional departments (arbitration division, treasury, back-office, accounting and control) did not know the real destination of the liquid assets, placed as time deposits and renewed every month by SWIFT messages of confirmation and ticket deals (SLIP) because the defendants Yurukoglu Levent Husein, Koncavar Murat, Yalcinkaya Cetin Figen did not present these departments with the pledge contracts they signed. As for the extension of placements in Esbank, the accounting expert report held that (vol. 2 DUP – page 80) on 31 October 2000, the 7 pledge contracts in the amount of 19,000,000 USD and 6,000,000 EUR were listed in the balance of account 1312 "Time deposits in banks" as a result of renewals by ticket deals (SLIP) and accounting notes for extensions of these time deposits (vol. 2 – pages 222-235), BTR extended the deposits in accounts in Esbank until the due date or after the maturity of loans which this bank had given to Bayindir, which resulted from the SWIFT message (vol. 2 – page 236-237) transmitted on 13 November 2000 by Esbank. On 27 November 2000, Esbank AC transmitted by telefax a declaration regarding the execution of collateral deposits of BTR in the amount of 19 million USD and 6 million EUR (vol. 2 – pages 238-239) because Bayindir did not repay the loans due on 13 November 2000.

15

During the period 28 December 1999 – 31 January 2000, the defendants Yurukoglu Levent Husein, Koncavar Murat, BTR president and vice-president signed with Banque Francaise de L'Orient 3 fiduciary contracts in the total amount of 4 million USD.

The transfer of amounts which made the object of fiduciary contracts was processed on the date when the contracts were signed. In order to carry out the contract signed on 28 December 1999 (vol. 2 – pages 140-140) *[SIC; page number repeated in source text]*, BTR transferred the amount of 10,000,000 USD in its foreign currency account opened with Banque Francaise for the creation of 2 time deposits and the placements were highlighted in the accounting system of BTR in account 1312 "Time deposits in banks". At maturity the two deposits were extended with SLIP no. 34293 and Accounting Note no. DY 17 of 28 January 2000 for the period 28 January 2000 – 28 February 2000, and they would operate at this value as time deposits with the monthly receipt of 12% interest per year.

The last extension of the two time deposits (actually fiduciary contracts) in the total amount of 10,000,000 USD was made on 30 October 2000, by SLIP no. 45351 and Accounting Note DY 10 of 30 October 2000 (vol. 2 – pages 153-154) for the period 30 October 2000 – 30 November 2000, being recorded in the accounting system of Banco Turca Romana in account 1312 "Time deposits in banks", thus the real content of the operation being misrepresented.

For the second fiduciary contract, signed on 18 January 2000 (vol. 2 – pages 145-146) BTR transferred the amount of 15,000,000 USD on the same day in the foreign currency account opened with Banque Francaise. The placement was recorded with Accounting Note no. DY 4 and SLIP 33752 of 18 January 2000 in account 1312 "Time deposits in banks", operated as a time deposit with the monthly receipt of 12% interest per year (vol. 2 – pages 151-152). The last extension of the time deposit (actually fiduciary contract) in the amount of 15,000,000 USD was made on 25 October 2000 with SLIP no. 45261 and Accounting Note DY 10 of 26 October 2000 (vol. 2 –pages 157-158) for the period 25 October 2000 – 27 November 2000 and was recorded in the accounting system in account 1312 "Time deposits in banks", misrepresented the real content of the operation made.

For the third fiduciary contract, signed on 31 January 2000 (vol. 2 – pages 148-149), BTR transferred the amount of 5,000,000 USD on 1 February 2000 into its foreign currency account opened with Banque Francaise. The placement was recorded with Accounting Note DY 17 and SLIP 34391 of 1 February 2000 in the accounting records in account 1312 "Time deposits in banks" and operated as time deposit with the monthly receipt of 12% interest (vol. 2 – pages 151-152). Later, an extension of time deposit (actually, fiduciary contract) was made on 10 October 2000 with SLIP no. 45108 and Accounting note DY 8 of 23 October 2000 (vol. 2 – pages 157-158) for the period 10 October 2000 – 10 November 2000 and it was recorded in the accounting system of BTR in account 1312 "Time deposits in banks", thus the real content of the operation being misrepresented.

The accounting entries of BTR by which the content of operations made with Banque Francaise de L'Orient were misrepresented because the BTR employees from the functional departments (arbitration division, treasury, back-office, accounting and control) did not know the destination given to the liquid assets placed as time deposits and renewed every month by SWIFT messages of confirmation and by ticket deals (SLIP), because the defendants Yurukoglu Levent Husein and Koncavar Murat did not give these departments the 3 fiduciary contracts signed with Banque Francaise.

By the letter no. 3024 of 10 April 2001 (vol. 3 – page 290) BTR made it clear that Bayindir did not request in writing BTR to secure the loans mentioned above and did not submit the necessary documentation for securing these loans.

The guarantee of Bayindir Company was not discussed in meetings of BTR's Board of Directors and therefore, was not approved.

The assignments and responsibilities of the Board of Directors and its work procedures and duration of mandate of its members are established in the Articles of Association of the bank. It was also stated that from the reports of the Board of Directors it did not result that BTR was formally informed about the loans taken out by the Turkish company and their guarantee by BTR, in order to record them in the accounting system, and that the Turkish company did not return the loans.

Also, by the letter no. 226 of 15 January 2002 BTR (vol. 3 – pages 1-2) stated that there was no internal regulation which allowed for the creation of collateral deposits in banks from abroad.

The reports of placements of BTR in other banks from abroad were made to the National Bank of Romania every day by modem and at the end of month they were electronically transmitted. The guarantee by a banking company for the execution of obligations of a natural or legal person towards its business partners based on commercial contracts was made by issuing a letter of bank guarantee; the registration in the accounting of the deposits mentioned above is made by the Back-Office Department from the Treasury Division.

From point 2 titled "Method of work" from "Work Instructions" regarding the application of "Norms for functioning of interbanking monetary market in lei" no. 4/1995 of NBR, of Banco Turca Romana S.A. – Treasury Division (vol. 3 – pages 7-8) it results that:

The transactions signed between BTR and other merchant banks on the interbanking monetary market by acceptance by both Parties of the deposit amount, period and interest level are written in the SLIP deal by the dealer, who signs them.

The SLIP deal in original is sent to the Back-Office for the reconfirmation to be transmitted by SWIFT or telex, as applicable.

The reconfirmation includes at the minimum the following elements: the counterparty; date of transaction; traded amount; time of transaction; interest rate; correspondents of the Parties; and method of conclusion of transaction.

A copy of SLIP deal is transmitted on transaction day to the Resources and Placements Department in order to draw up the banker's draft for placed deposits or to record the monitoring of entry of amounts for deposits liabilities.

The operation in the internal accounting system of the bank is assured by the Back-Office, and the authorization of entries is made at the end of the day by the division employee who has such assignments.

The SLIP deal with a copy of the accounting note and reconfirmation of deposit are kept in the archives of the Treasury Division archive. The copy no. 2 of the accounting note attached to the Journal of daily operations is sent to the Accounting and Control Division.

Both counterparts of the accounting note are checked by the deputy manager of the Treasury Division.

The state of fact exposed above is proven by the declarations of witnesses heard both in the criminal prosecution stage and during the judicial inquiry.

The witness Gheorghe Bogdan (vol. I DUP – page 588 and vol. III page 108 of the file) showed that he filled the position of equity trader in BTR (during the period 1996-1998), head of department (June 1998 – May 1999) and Manager of Arbitration Department (June 1999 – October 2000) and among the assignments of this last position there was the administration of funds in lei and available foreign currency As for the placements in foreign currency in Banque Francaise de L'Orient, Demirbank, Es bank Ac Vienna, Finansbank N.V. Netherlands, Dinamic Bank, he specified that the placements were ordered exclusively by the bank management and specifically by the defendants Tobur, Tulgar and Yurukoglu.

The bank managers provided the amounts, as well as the deadlines and the specific banks where the deposits would be placed and he ,in turn, transmitted this information to his subordinates, for processing. At the due date of each deposit he would ask the president to communicate the instructions regarding the extension of deposits. Some deposits were started in 1998, the deadlines were only extended and other deposits were created in the interim. After the conclusion of transactions their tickets were sent over to the Back-Office and were processed by the accounting. He was aware at all times that the money was placed in time deposits and was not informed by management that they were turned into a collateral deposits. He has never seen guarantee contracts signed between BTR and the banks mentioned above, the tickets never mentioned the existence of such agreements. His department had only assignments to execute the placement orders and did not have the assignment to provide advisory consultations. The orders he received referred to the placements that had to be made and to which banks, without providing information about the nature of deposit.

The witness Osman Sena (vol. 1 DUP – pages 589-591 and vol. III of file, page 106) was hired during the period 1994-2001 at BTR in the Treasury and during the period 1998-2001 she filled the position of head of Arbitration Operations Department, and had as job duties the processing of all transactions made by equity traders, which means both the recording in accounting and the preparation of messages for banks confirmations She showed that she did not have any information about possible collateral deposits, about which she learned of at the end of the year 2000.

As for the documents related to these placements and which were presented by the police, she declared that they were from BTR and the accounting notes were recorded by the Back-Office department, as time placements, with her approval, but the date when the placements were made and the documents based on which the accounting entries were made do not prove that it was about other kinds of transactions, not time deposits and did not know that these time deposits were actually collateral deposits. All the entries made by the Back-office were automatically put in the software system and transmitted to the Accounting Department.

18

Dobre Carmen, who was heard as a witness (vol. 1 DUP – page 594 and vol. III of file, page 137) *[not sure if it is vol. 1 or I; I used 1, source text unclear]* showed that since December 1997 until July 2002, she successively filled the positions of economist and head of Accounting Department in the headquarters of the bank. Her job duties were drawing up of statements reported to the National Bank of Romania, monthly statements required by the bank management or the lending company. She also was in charge of calculation of assets, performance indicators of the bank, the patrimony statement, the quarterly financial statements and the balance sheet and mentioned that the accounting entries were made by each department up to the level of monthly balances, statements of income and expenses for each day, thanks to the accounting system of the bank, which allowed it, at the end of each day, the data was processed and a centralized verification balance was generated.

As for the financial placements made by BTR in banks from abroad, she declared that the accounting records were made by the Back-Office Department from the Treasury Division, based on the documents drawn up for this purpose. The head of this department was Osman Sena. Every time during 1998-2000 in the accounting system these placements were recorded as time deposits, with deadlines of a maximum of one month. There also appeared the interest received based on deposits. This data was collected and included in the verification balance and ultimately were used in the balance sheet calculations. The balance sheet was signed by the manager of the Accounting Department and the president of the bank or in his absence, by a vice-president.

She did not know that financial placements were made in foreign banks, which later the bank management turned into guarantees and loans given to Bayindir Company from Turkey and she never saw any fiduciary contract or another kind of contract signed by the bank management with banks from abroad.

All the reports to N.B.R. and balance sheets were drawn up in good faith based on the data that existed in the accounting and the documents which reflected the operations made. These fiduciary contracts were never presented to the Accounting Department.

Cioflan Aristide (vol. 1 DUP pages 598-599 and vol. III of file, page 139) in January 1994 he was the manager of the Accounting Department and in February 2001 he was appointed to the Board of Directors of the bank, with job duties including the organization of accounting, daily keeping up-to-date accounting records, drawing up reports for the bank management and for NBR, drawing up the profit and loss account and balance sheet which he signed with the president of the bank. He showed that the accounting system of the bank allowed the Back-office Department from Dealing to make primary accounting entries directly on computer.

Every day the Treasury Manager received a copy of the balance of operations for approval, then he would send it to the Accounting Department. He also approved the sending of SWIFTs by the subordinated employees. The Back-Office Manager during 1999-2000 was Vinulescu Constantin and the Dealing Manager was Bogdan Gheorghe. The witness showed that he did not know that the heads of Banco Turca Romana S.A. transformed certain time deposits into  collateral deposits and signed fiduciary contracts with various banks where the money was used for lending and to guarantee Bayindir Company Group from Turkey.

19

These contracts were not submitted to the bank and their signatories did not inform the bank about their signing and conclusion. Considering that he did not know about the existence of the contracts and did not hold them, all the accounting entries and reports to NBR were drawn up based on the data held and the placements were recorded as time deposits. All these reports and the balance sheet for the year 2000 were signed by him in good faith. Since 8 November 2000 when he learned from N.B.R. about these operations, he recorded these operations as follows: the amounts from Dinamic Bank were recorded as debts of Bayindir Group and he created non-deductible commissions for them, as there were no commercial relations with them. The amounts from Banque Francaise de L'Orient were not overdue until January 2001 and he recorded them as loans of Bayindir Company and created fiscally deductible provisions. The witness declared that about 54 million USD plus interest remained unrecovered.. The entries were reflected in the balance sheet for the year 2000 and the witness showed that since the announcement regarding the default of BTR the world panicked and the banks which had deposits and the customers started to submit withdrawal applications. The debts of the bank were paid in a proportion of 92% and debts of 45 million dollars remained. The witness showed that Bayindir Group paid a large part of its debt, but even if it had paid the remaining 45 million lei the result would have been the same because the image of the bank suffered a lot and it could not carry out normal activity. The fact that they used interest of 12% while on the market there was interest of 6% for deposits of that kind, and because it was received in time, the embezzlement of these deposits from their destination, reflected in the accounting was not perceived as such and there were no suspicions regarding the nature of these deposits.

Şerban Anca (vol. 1 DUP – pages 602-603 and vol. III of the file, page 164) worked as equity trader (during May 1997 – July 1999) and head of the department during the period July 1999 – January 2001). As an equity trader he had the job duty to receive the statement of funds in lei and foreign currency from the Treasury Service. As for funds in foreign currency, he initially contacted the president of the bank, Levent Yurukoglu and then, Muslu Arzu, marketing manager, who indicated where, how much and in what period he should place the funds or if they had to be renewed. As the head of the department he checked the operations, monitored the maintenance of foreign currency to lei ratio in the limits established by NBR, and drew up the documents for the auctions of securities issued by the Ministry of Finances. Almost all the funds were focused on Turkish banks, because the interest was very high compared to the interest offered by western banks, almost double.

Arbitration was communicating through with the bank through Dealing after the conclusion of transaction. In the Back-Office the accuracy of the ticket was verified with the transaction data by comparing it with the copy of conversation carried out between banks through Dealing. The ticket was signed by the person who drew it up, by any other colleague and then, based on it the SWIFT message for confirmation of deposit was drawn up and the message was transmitted to the bank with which the transaction was signed.

Also, that bank sent a SWIFT message for confirmation of deposit and following the reception of this message the accounting note was drawn up and was recorded in the accounting system. The SWIFT message of confirmation stopped at line 57, without any other explanation; it meant time deposit.

He did not know that the deposits in foreign currency were collateral deposits, was not informed by the management or somebody else about it. He learned about the existence of collateral contracts from Manager Cinteză in November 2000, after the scandal broke out.

20

As for Dinamic Bank, the confirmations of deposit were sent by fax and not by SWIFT and the arbitration drew up tickets based on these confirmations, not by direct conversation.

I have not seen any collateral deposit contract until December 2000 when Esbank Vienna or Banque Francaise de L'Orient de Geneva transmitted by fax a copy of a contract signed by the president Tobur and vice-president Koray Tulgar.

Following the express request of NBR, Banque Francaise de L'Orient de Geneva or Esbank Vienna transmitted by fax a collateral deposit contract signed by the president Tobur and vice-president Koray Tulgar. Finansbank Holland and Finansbank Switzerland did not reply, they only returned the deposits.

He learned about the fact that the banks with the deposits executed the collateral contracts from the officials of NBR in December 2000.

The witness Şerban Remus Luigi (vol. 1 DUP – page 604 and vol. III of the file, page 162), equity trader during November 1999 – January 2001, had assignments regarding the conclusion of transactions for attraction/placement of liquid assets in lei and foreign currency in the interbanking system on domestic and external markets, mentioned that he did not know that these deposits were collaterals to loans, which he learned about in December 2000 after the information on the results of checks performed by NBR in the condition of financial difficulties of BTR recorded at the end of year 2000. All the deposits he worked with were free of encumbrances and could not be used as guarantees. Even if what his department did represented a agreement in principle, it was not enough for performing the operations; the effective corrections and improvements were made by the Back-Office structures and approved in accounting by other structures. The witness specified that any person from the bank management could give orders or instructions regarding the placements in foreign currency.

Heard in the criminal prosecution stage, the witness Cinteză Nicolae, Manager of the Supervisory Division of the National Bank of Romania, declared (vol. 1 DUP – pages 652-657) that the first signal regarding the impossibility of recovering the amounts in foreign currency placed abroad was given at the beginning of November 2000 by the former president of BTR, Levent Yurukoglu and the former vice-president, Cristian Dumitrescu, who presented themselves at NBR at the vice-governor coordinator of Supervisory Division, Bogza Mihai and communicated to him that there were problems with the deposits.

In the same evening (6-7 November) Levent Yurukoglu was called to NBR and in the presence of NBR Governor, Emil Ghizari, and vice-governor Bogza Mihai declared that there were no problems with the deposits. From the documents presented to the control team it did not appear that those deposits were committed in favour of a third party and the reports made by BTR did not highlight the collateral nature of those deposits or the commitment of the Bank to Bayindir Group. The contracts based on which the deposits were committed were not found at the BTR office.

The witness Muslu Arzu Ayse, marketing manager, responsible for Turkish customers' relations, declared (vol. I – pages 584-585) *[not sure if it is vol. I or 1; I used 1; text source not clear]* that she knew from the balance sheet of the bank that some deposits were made, but she did not know that they represented guarantees for the Turkish company, Bayindir. The same situation was described by the

witness Bodîrcă Cristian, equity trader, who learned that actually, they represented guarantees for a third party only after the representatives of NBR came to check.

The witnesses Vinulescu Constantin, vol. III of the file, page 244, Vâlvoi Mocanu Constantin, vol. III – page 335 of the file claimed that they did not know the real nature of these deposits, they knew that they were time deposits free of any encumbrances.

In the criminal prosecution stage, defendant MURAT KONCAVAR (vol. 4 – pages 62-65) showed that during the period February 1997 – 4 May 2000 he worked as vice-president of BTR and was in charge of marketing, public relations, investigations, and the loans department. In connection with the banking placements made by BTR for securing the loans obtained from these banks by Bayindir Company, he claimed that this was possible according to article 1, point A of the Regulations for organization and functioning of BTR. He also showed that he did not remember anything about the commitment contracts by which during the period 23. June 1999 – 26 July 1999, in the name of BTR as vice-president and Yurukoglu Levent as president transmitted to Demirbank – Malta Branch and Demirbank – Bahrain Branch the irrevocable and unconditional acceptance that the placements of BTR in this bank represented guarantees for the loan facilities given to Bayindir Group.

He also showed that during the period when the amounts mentioned above were placed in Demirbank, BTR had enough banking liquid assets because the internal customers of the bank had not requested loans. In relation to the highlighting in the accounting of these placements as time deposits instead of collateral deposits, he mentioned that he did not know anything because the accounting and treasury departments were subordinated to other vice-presidents. At the General Meetings of Shareholders they discussed the interests received at the placements from banks from abroad, but they did not refer to their true legal nature, as collateral deposits. The defendant showed that he did not remember whether he signed any contract by which BTR had taken the commitment to secure unconditionally loans of Bayindir Group.

Dumitrescu Cristian, heard by the criminal prosecution bodies, showed that in the conclusion of contracts with other banks Banco Turca Romana had to be represented by two persons from bank management, there was an authorized list of signatures of persons who could commit the bank, among whom himself was on the list. When he signed the contract of 04 February 1998, he signed at the suggestion of Yurukoglu Levent Husein with other documents, relying on the mutual confidence which existed for many years between them, at that time he did not know the true object of the contract.

He mentioned that he did not know the object of the contract in the amount of 6 million dollars he signed on 2 September 1999 at the suggestion of the same Yurukoglu Levent Husein, who at that time filled the position of president of Banco Turca Romana. On 4 and 5 May 2000 at the request of interim president of Banco Turca Romana, Yalcinkaya Cetin Figen he signed two contracts which had as their objective securing two loans in the amount of 4 million and 1 million dollars, respectively, given to Bayindir Group by Esbank AG Vienna. He mentioned that he initially opposed signing these contracts, but he gave in at the insistence of Yalcinkaya Cetin Figen and his assurance that the financing would be for a very short time, maximum one month and there would not be problems for Banco Turca Romana. Also, Yalcinkaya Cetin Figen told him that Cortuk Kamuran urgently needed these amounts of money for a very short time.

22

He did not see any application for the foundation of collateral deposits in the amount of 4 and 1 million dollars submitted by Bayindir Group and he did not ask Yalcinkaya Cetin Figen to show him such document, he trusted him.

By the end of November 2000 all the amounts from collateral deposits which were the object of the four contracts mentioned above, signed by him were returned by the banks from abroad as a result of payment of loans by Bayindir Group. Therefore, by his signing of these contracts he did not cause any prejudice. The defendant showed that the four contracts were not subject to approval of the Board of Directors and did not know anything about the conclusion of other collateral deposit contracts by Banco Turca Romana with other banks from abroad in favour of Bayindir Group.

According to the Banking Law no. 58/1998, further amended and supplemented and the Regulation no. 3 of 23 December 1997 regarding exchange operations, the Romanian banks created in legal form, as joint-stock companies, can open and maintain accounts in foreign currency abroad and can make exchange operations in their own name and account. By virtue of article 8 of Law no. 58/1998 the banks are allowed to carry out a series of activities within the limit of authorization, among which are: the issue of guarantees and undertaking of commitments; transfers of funds; and acceptance of deposits.

According to the provisions included in Chapter IV, article 17 of Regulation no. 3/1997 regarding exchange operations, the banks and implicitly Banco Turca Romana S.A. can open and maintain accounts in foreign currency abroad for the activity carried out based on licence, without the obligation to hold the authorization of the National Bank of Romania. In the accounts in foreign currency opened with banks from abroad, the residents, including Banco Turca Romana S.A., can make exchange operations, as defined by point I.17 of Regulation no. 3: "The receipts, payments, set-offs, transfers, lending and any other transactions expressed in foreign currency can be made by bank transfer, in cash, with payment instruments or by other payment methods agreed to or accepted by the banks". Also, the Romanian banks have the legal capability to secure or lend loans to Romanian or foreign private companies so that these companies obtain loans from abroad, with the strict observance of legal provisions and their own working norms. Banco Turca Romana S.A. did not draw up and approve their own working norms which allowed for the creation of collateral deposits in foreign currency at banks from abroad. However, ignoring the legal provisions, Banco Turca Romana S.A. was committed above the exposure limit set out by the norms of the National Bank of Romania by signing guarantee/financing contracts for loans given by external correspondent banks with Turkish capital from the Netherlands, Vienna, Geneva, Malta, Bahrain and Northern Cyprus to Bayindir Group, the majority shareholder of the bank. By not submitting those contracts to Banco Turca Romana S.A. and by issuing documents for placement/extension of deposits as time deposits, not collateral deposits or loan, they sought to hide the real economic content of those operations, by drawing up fictitious financial statements (balance sheet, reports to N.B.R.). For the lending or financing commitments given in favour of Bayindir Group no guarantees were created and no commissions were charged. As a result of not repaying those loans by Bayindir Group and the impossibility to execute the guarantees (because of their non-existence), the deposits placed in Dinamic Bank of Cyprus, in the amount of 19.9 million USD and 8.8 million EUR were executed upon by that bank.

According to the report of NBR, BTR calculated and transmitted to NBR a fictitious level of its own funds, and by that it misrepresented the content of banking prudential reports by violating the

provisions of article 69 L 58/1998. On 31 December 2000 all the banking prudential indicators calculated according to their own funds of the bank were outside of regulated limits, becoming irrelevant. As a result of its liquid assets crisis BTR was not able to fulfil the obligations established by NBR by Regulation no. 4/1998, respectively the creation of a minimum compulsory reserve at the set level. Following the same crisis BTR recorded situations when the debt instruments were not fully paid within at least 30 days from the debiting of the customer's account. It was concluded that BTR was classified on 31 January 2001 within the provisions of article 2(1)(a) of Law no. 83/1998 regarding banking bankruptcy proceedings, "a bank is considered insolvable if...........it did not fully pay certain, liquid and exigible receivables within at least 30 days".

On 31 January 2001 the net negative worth recorded by Banco Turca Romana proved its insolvency. The creation of placements in 4 foreign banks under the form of collateral deposits in the amount of 122,800,000 equivalent in USD for securing loans given by these banks, to Bayindir Company led to the confrontation of the bank with the dramatic decrease of liquid assets of the bank, placing the bank in the position of net borrower on the interbanking monetary market, which could not be managed by the bank management. As a result of this creation of collateral deposits in banks from abroad, for securing loan facilities given to Bayindir Group by those banks, in the account of loans made on the domestic interbanking market and use of liquid assets that existed in accounts and deposits of bank customers, the Banco Turca Romana came across an acute lack of liquid assets, which finally led to its bankruptcy.

The consequences shown above were due, as we said, to the faulty fulfilment of job duties by defendants Yurukoglu Levent Husein, Koncavar Murat, Yalcinkaya Cetin Figen and Dumitrescu Cristian.

Thus, the defendants Yurukoglu Levent Husein as president of BTR, Koncavar Murat, vice-president of BTR, Yalcinkaya Cetin Figen, vice-president and Dumitrescu Cristian, vice-president committed the bank above the exposure limit set out by the norms of the National Bank of Romania by signing guarantee/financing contracts for loans given by foreign banks to Bayindir Group and as a result of the carrying out of contracts, as shown above, they caused not only an important prejudice to the assets of the civil Party but also a significant disturbance of its activity, which ended up in bankruptcy proceedings.

*By law*, the criminal offences of defendants fulfils the constitutive content of the crime of abuse of office against public interests in aggravated form, set out and punished by article 248 related to article 248[1] Criminal Code. They committed the criminal offence deed with intention, because they foresaw and accepted that they would cause a significant disturbance of the good functioning of the institution, whose civil servants they are, and also caused/brought a prejudice to its assets. The defendants committed the criminal offence together, and the provisions of article 75 (a) Criminal Code are incidental, the criminal offence was committed in aggravating circumstances set out by this text.

As for the defendant Kamuran Cortuk the Court accused him of committing the crime of incitement to the crime of abuse of office against public interests, in aggravated form, set out by the article 25 Criminal Code related to article 248 Criminal Code combined with article 248[1] Criminal Code, with the application of article 75(a) Criminal Code. He, as member of the Board of Directors of BTR, caused the other defendants to faultily fulfil their job duties (as described above). Thus, the defendant had this capacity of member of the Board of Directors, despite the fact that he was majority president of the

Bayindir Company, majority shareholder of BTR, and he caused the other defendants with power of decision in establishing the nature of each deposit created, to help the company, whose representative he was, to obtain loan facilities from foreign banks by securing those loans. The defendant Kamuran Cortuk as administrator of Banco Turca Romana and president of the Board of Directors of Bayindir Holding Company – majority shareholder of BTR required the executive management of this bank, during 1998-April 2000, to commit the liquid assets from the accounts of the bank as collateral deposits in banks from abroad for financing and securing the loans taken out by Bayindir.

The facts above show without doubt that the procedure used by Levent Yurukoglu – president and Murat Koncavar – vice-president, signatories of the documents for creation of collateral deposits used for securing the loans taken out by Bayindir was known and monitored by Kamuran Cortuk, being conceived to elude the provisions of Banking Law no. 58/1998, respectively the articles 29-31, 44 and 45. All the placements described above were made in the exclusive interest of this company which finally, by not paying its debts on the due date, determined the financial collapse of BTR which led to its bankruptcy.

Given the circumstances in which the criminal offences were committed, the degree of social danger, the immediate consequence and the other criteria for individualization of the punishment set out by article 72 Criminal Code, the Court will choose the approach for the imprisonment in differing amounts for defendant Kamuran Cortuk and defendant Dumitrescu Cristian, considering for the former his decisive contribution in causing the other defendants to commit the crimes of abuse of office and considering for the latter that he was minority in the Board of Directors, the greater power of decision belonged to the other defendants, which does not exonerate him from guilt, because he was not forced to participate in any way in the implementation of the decision to change the legal nature of certain placements and if he disagreed with the other members, nobody stopped him from not signing the commitment contracts and to report the illicit nature of these operations.

From the method by which the procedures shown above were committed, it resulted that to hide the nature of these placements they proceeded to their recording in the accounting of time deposits (account 1312) and not the specific account of guarantee deposits (account 1313 and 901). These entries were made by various civil servants from Accounting, Treasury, Back-Office departments, and civil servants, who as shown by the rules of evidence produced in the case, did not know the true nature of these deposits they recorded, because the data was presented by the management of BTR, they did not have access to the documentation of these deposits and learned the truth only when the default of BTR was noted. Although in article 57 of Law no. 58/1998 (Banking Law) it sets out "The banks have to keep permanent accounting records according to the provisions of accounting law and specific regulations given in its application and to draw up adequate financial statements, to reflect accordingly the operations and their financial condition", the placements under the form of deposits in foreign banks, in the amount of 108,000,000 USD and 14,800,000 EUR, on 31 October 2000 were highlighted in the accounting system of Banco Turca Romana S.A. in account 1312 "Time deposits in banks" although they actually represented collateral deposits created by Banco Turca Romana in banks from abroad for securing loan facilities given by these banks to Bayindir Group.

As for this issue, in conclusions of accounting expert report (vol. 2 DUP – pages 97-100) it is stated that according to the Chart of Accounts and Methodological Norms for its use, approved by the Ministry of Finances and the National Bank of Romania, on 1 August 1997 under no. 1418, respectively

no. 344, those operations had to be reflected in account 1313 "Collateral deposits in banks" and the commitment of Banco Turca Romana in favour of foreign banks, undertaken in the name of Bayindir Group, had to be recorded in off-balance accounts, in account 901 "Commitments in favour of other banks".

The defective highlighting in the accounting of collateral deposits placed in the four banks from abroad by Banco Turca Romana was because the employees of the bank from functional departments (Arbitration division, Treasury, Back-Office, Accounting and Control) did not know the real destination of the liquid assets placed as time deposits and renewed every month by SWIFT message of confirmation and ticket deals (SLIP) because the management persons who signed the documents for creation of collateral deposits did not provide those documents to those departments.

The accounting expert report holds that by not highlighting in the accounting and in the reports drawn up by Banco Turca Romana of the guarantees given to Bayindir Group, they violated the provisions of article 2 of Accounting Law no. 82/1991, article 1 of Order of Minister of finances and governor of National Bank of Romania no. 1418/344/1997, article 19 of Chart of Accounts for banking companies, approved by Order of the Minister of Public Finances and Governor of the National Bank of Romania no. 1418/344/1997 and article 54, 56-57, 69 (1)(a)(c)(d) and (f) of Banking Law no. 58/1998.

The material acts for determining these civil servants to make inaccurate entries in the accounting system of BTR were made at intervals of time, but in the realization of the same criminal resolution and to fulfil the constitutive elements of the crime of participation in intellectual forgery set out by article 31(2) Criminal Code related to article 43 of Law no. 82/1991, republished, related to article 289 Criminal Code, with the application of article 41(2) Criminal Code and article 75(1) (a) of Criminal Code. At the date of notification act the crime described above was regulated by article 40 of Law no. 82/1991, later republished, they gave the texts new numbering and the provisions of article 40 from the initial form of the law can be found entirely in the text of article 43. Because they only gave new numbers, the provisions of article 13 Criminal Code are not incidental; there is not a choice of a more favourable law.

The Court, given the reasons presented above, will hold the guilt of defendants Kamuran Cortuk, Koncavar Murat, Yurukoglu Levent Husein, Yalcinkaya Cetin Figen, Dumitrescu Cristian, Ercelik Mustafa Kemal, Tobur Mehmet Fahim, Tulgar Koray regarding the comission with intention of the criminal offence set out by article 31(2), Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code. They, as presidents, vice-presidents, members of the Board of Directors caused the employees of BTR to make inaccurate entries in accounting, which had as consequence the misrepresentation of assets and liabilities reflected in the balance sheet.

As for defendant Yurukoglu Levent Husein, the Court will hold him for committing the criminal offence set out of article 271 point 2 of Law no. 31/1990 republished with the application of article 41(2) Criminal Code. He, as executive president of BTR and president of the Board of Directors on 19 March 1999 and 30 March 2000, in the realization of the same criminal resolution acted with bad faith towards shareholders, at General Meeting of Shareholders, presenting inaccurate balance sheets with the purpose of hiding the real situation of BTR. article 271 point 2 repeats the full text of article 265 point 2 of Law no. 31/1990 in its initial form, in this form it was illustrated in the content of notification act, the Court did not apply article 13 Criminal Code for the same reasons shown above regarding the Law no. 82/1991.

As to the individualization of punishments which will be applied to defendants, the Court will consider the provisions of article 72 Criminal Code, as the degree of social danger of the criminal offence was high, the immediate consequences being very serious and with major implications not only for the civil Party but also its injured customers, the resonance of the criminal offences committed can shatter the confidence in the stability of the banking system. Also, the Court will hold the dishonest attitude of defendants who did not recognize their criminal offences, made the investigations difficult by various unjustified requests regarding their summoning while they were informed of the accusations, and their passiveness towards the prejudice suffered by the civil Party.

*The Civil Side:* from the conclusions of accounting expert report (vol. 2 DUP pages 90-97) the Court holds that Banco Turca Romana placed and maintained the total amounts of 108,000,000 USD and 14,800,000 EUR in the accounts in foreign currency opened with foreign banks mentioned, effective 3 February 1998 until 1 February 2001.

During the period 13 November 2000 – 3 April 2001 the total amount of 62,166,666.67 USD and 6,000,000 EUR (equivalent in dollars of 5,080,000) was recovered as a result of repayment to the foreign banks of a part of loans given to Bayindir Group or by direct receipt of amounts from natural and legal persons who belong to Bayindir Group. The recovered amounts and amounts left to be recovered from the deposits placed in these banks are presented in annex no. 63 (vol. 2 DUP page 241). The prejudice caused to BTR on 31 December 2002 as result of non-recovery of amounts placed in banks from abroad for securing the loan facilities given to Bayindir Insaat Turizm Ticaret ve Sanayi AS is in total amount of 59,421,921.04 USD for placements not recovered and related interest and 11,326,199.99 EUR placements not recovered and related interest until 31 March 2003.

Therefore, given the reasons above, the Court by virtue of article 25 Criminal Code related to article 248-248[1] Criminal Code, with application of article 75(1)(a) Criminal Code will sentence the defendant Kamuran Cortuk to 13 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34 (b) Criminal Code the defendant will serve the hardest punishment of 13 years of imprisonment.

The Court will apply the provisions of article 71-64 (c) Criminal Code.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the defendant Ercelik Mustafa Kemal to 5 years of imprisonment.

The Court will apply the provisions of article 71-64 (c) Criminal Code.

By virtue of article 248-248[1] Criminal Code, with application of article 75(1)(a) Criminal Code, the Court will sentence the defendant Koncavar Murat to 11 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 11 years of imprisonment.

The Court will apply the provisions of article 71-64 (c) Criminal Code.

By virtue of article 88 Criminal Code the Court will deduct from the duration of punishment the duration of remand in custody of defendant during the period 2 June 2003-29 July 2003.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the defendant Tobur Mehmet Fahim to 5 years of imprisonment.

The Court will apply the provisions of article 71-64(c) Criminal Code.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the defendant Tulgar Koray to 5 years of imprisonment.

The Court will apply the provisions of article 71-64(c) Criminal Code.

By virtue of article 248-248[1] Criminal Code, with application of article 75(1)(a) Criminal Code, the Court will sentence the defendant Yalcinkaya Cetin Figen to 11 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the same defendant to 5 years of imprisonment.

By virtue of article 33 (a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 11 years of imprisonment.

The Court will apply the provisions of article 71-64(c) Criminal Code.

By virtue of article 248-248[1] Criminal Code, with application of article 75(1)(a) Criminal Code, the Court will sentence the defendant Yurukoglu Levent Husein to 11 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the same defendant to 5 years of imprisonment.

By virtue of article 271 point 2 Law no. 31/1990 republished with application of article 41(2) Criminal Code the Court will sentence the same defendant to a punishment of 5 year imprisonment.

By virtue of article 33 (a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 11 years of imprisonment.

28

The Court will apply the provisions of article 71-64 (c) Criminal Code. Thus, the Court will prohibit the defendants the right to fill any position, to exercise a profession or carry out any activity of the nature they used for committing the crime, because they became unworthy of exercising such activities, punishment to be served after the execution of imprisonment. Because electoral rights in the territory of Romania are not recognized to these defendants and they cannot fill positions which involve the exercise of public authority or public elective functions, rights recognized and guaranteed by Constitution only to Romanian citizens, the Court will not apply the provisions of article 64(a)(b) Criminal Code.

By virtue of article 248-248[1] Criminal Code, with application of article 75(1)(a) Criminal Code, the Court will sentence the defendant Dumitrescu Cristian to 9 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court will sentence the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 9 years of imprisonment.

The Court will apply the provisions of article 71-64(a) second thesis, "b" and "c" Criminal Code. It will apply the article 71-64(a), final thesis and letter b Criminal Code in consideration of ECHR *[ECHR - European Court of Human Rights]* jurisprudence with reference to cases Sabău and Parcălab versus Romania and Hirst versus Great Britain. In these cases the Court appreciated that the application of accessory punishment cannot lead by law to the interdiction of the voting right and the right to fill a position or exercise a profession of the nature of the one the defendant used for committing the crime. As for the accessory punishment, the Court holds that the nature of the committed crime, the criminal persistence, the personal circumstances of defendant lead to the conclusion of an unworthiness in exercise of electoral rights set out by article 64 letter a, second thesis and letter b of Criminal Code, respectively the right to be elected in public authorities or in public elective functions and the right to fill a position which involves the exercise of state authority, for which reason the exercise of these rights will be prohibited during the execution of punishment.

The Court will not prohibit the defendant the right to elect, but only the right to be elected considering the requirements of ECHR, reflected in the Decision of 6 October 2005, in the case of Hirst versus United Kingdom of Great Britain and Northern Ireland, in which the Court appreciated by keeping the line established by decision Sabău and Pîrcălab versus Romania that the interdiction ope legis of electoral rights is not required, it has to be disposed depending on the nature of crime or its particular seriousness.

Or, the crime which made the object of this case does not have electoral connotation or any special seriousness so that the Court appreciates that the interdiction of the right to elect is not required.

The right to be elected is required to be prohibited because from the penitentiary the convicted could not fulfil the elective functions and could not represent a model of conduct for citizens.

Also, it will prohibit the defendant the right to fill a position, to exercise a profession or carry out an activity of the nature of that he used for committing the crime, because he became unworthy of exercising such activities, punishment which will be served after the execution of imprisonment.

By virtue of article 353 Criminal Procedural Code it will maintain the distraint upon property disposed by ordinance no. 00069 of 10 May 2001 by the criminal investigation body regarding the assets of defendants. This measure is justified because the prejudice suffered by the civil Party is important, the defendants did not submit a minimum of diligences to cover at least partly the prejudice, the civil Party having thus the guarantee that at least a part of this prejudice could be covered.

By virtue of article 14 related to article 346 Criminal Procedural Code and article 998-999 Civil Code it will oblige the defendants to pay 59,421,921.04 USD and 11,326,199.99 EUR in equivalent in lei at payment day, with the legal interest calculated starting on 31 March 2003 until the full payment of the debt to the civil Party Banco Turca Romana through the liquidator Bank Deposit Guarantee Fund.

By virtue of article 191(2) Criminal Procedural Code it will oblige the defendants to pay 4000 lei court costs to the state, 500 lei each.

FOR THESE REASONS,

IN THE NAME OF THE LAW

DECIDES

I.    By virtue of article       25 Criminal Code related to article 248-248[1] Criminal Code, with application of article 75(1)(a) Criminal Code the Court sentences the defendant **KAMURAN CORTUK** residing at Samsun – Tekkekoy, Cirakman commune, Sabit Sagiroglu no. 5, Turkey, summoned and by display on the Court door and at the office of C.L.S.1 to 13 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 13 years of imprisonment.

The Court applies the provisions of article 71-64(c) Criminal Code.

II.    By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences defendant **ERCELIK MUSTAFA KEMAL,** residing in Turkey, Eskisehirr Merkez Mutallip CD NO 331, summoned and by display on Court door and at the office of C.L.S.1 to 5 years of imprisonment.

The Court applies the provisions of article 71-64(c) Criminal Code.

30

III.     By virtue of articles 248-248¹ Criminal Code, with the application of article 75(1)(a) Criminal Code, it sentences the defendant **KONCAVAR MURAT**, residing in Bucharest, Libertății Boulevard, no. 10, block 114, entrance 1, 3rd floor, flat 8, District 4, summoned and by display on Court door and at the office of C.L.S.1 to 11 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 11 years of imprisonment.

The Court applies the provisions of article 71-64(c) Criminal Code.

By virtue of article 88 Criminal Code it deducts from the duration of punishment the duration of remand in custody of the defendant during the period 2 June 2002 – 29 July 2003.

IV.     By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences the defendant **TOBUR MEHMET FAHIM**, residing in Turkey, Istanbul, Atakoy, 5 Kisim E I6 AD 19, summoned and by display on the Court door and at the office of C.L.S.1 to 5 years of imprisonment.

The Court applies the provisions of article 71-64(c) Criminal Code.

V.     By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences the defendant **TULGAR KORAY**, residing in Turkey, Istanbul, Nispetiye CAD Kerem 1 Ap. no. 24 – A D:11 summoned and by display on the Court door and at the office of C.L.S.1 to 5 years of imprisonment.

The Court applies the provisions of article 71-64(c) Criminal Code.

VI.     By virtue of articles 248-248¹ Criminal Code, with the application of article 75(1)(a) Criminal Code, it sentences the defendant **YALCINKAYA CETIN FIGEN**, residing in Ankara, Turkey, Mutlu Mah, Zabita Bloklari 127 Sokak, no. 12, Akdere and Istanbul, Turkey, Igrip Sokak Ap. 25/21 Fenerbahce, Kadikoy; summoned and by display on Court door and at the office of C.L.S.1 to 11 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 11 years of imprisonment.

The Court applies the provisions of article 71-64 (c) Criminal Code.

VII.    By virtue of articles 248-248[1] Criminal Code, with the application of article 75(1)(a) Criminal Code, it sentences the defendant **YURUKOGLU LEVENT HUSEIN**, residing in Istanbul, Turkey, 4 Levent, Otoyolcular Sitesi, block no. 10 B, sc. D, ap. 5, summoned and by display on Court door and at the office of C.L.S.1 to 11 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 11 years of imprisonment.

The Court applies the provisions of article 71-64(c) Criminal Code.

VIII.    By virtue of articles 248-248[1] Criminal Code, with the application of article 75(1)(a) Criminal Code, it sentences the defendant **DUMITRESCU CRISTIAN**, residing in  Bucharest, Țintașului Street, no. 3, District 1, to 9 years of imprisonment.

By virtue of article 31(2) Criminal Code related to article 43 of Law no. 82/1991 republished, related to article 289 Criminal Code, with application of article 41(2) Criminal Code and article 75(1)(a) Criminal Code the Court sentences the same defendant to 5 years of imprisonment.

By virtue of article 33(a) related to article 34(b) Criminal Code the defendant will serve the hardest punishment of 11 years of imprisonment.

The Court applies the provisions of article 71-64(a) second thesis, "b" and "c" of Criminal Code.

By virtue of article 353 Criminal Procedural Code it maintains the distraint upon property disposed by ordinance no. 00069 of 10 May 2001 by the criminal investigation body regarding the assets of defendants.

By virtue of article 14 related to article 346 Criminal Procedural Code and article 998-999 Civil Code it obliges the defendants to pay 59,421,921.04 USD and 11,326,199.99 EUR in equivalent in lei at payment day, with the legal interest calculated effective 31 March 2003 until the full payment of the debt to the civil Party Banco Turca Romana through the liquidator Bank Deposit Guarantee Fund, with the office in Bucharest, 4-6 Aleea Negru Vodă Street, District 3.

By virtue of article 191(2) Criminal Procedural Code the Court obliges the defendants to pay 4000 lei judicial costs to the state, 500 lei each in ACCOUNT IBAN: RO59TREZ7035032XXX005229, FISCAL CODE 434063307 OPENED WITH TREASURY DISTRICT 3, BENEFICIARY DISTRICT COURT 1.

With appeal in 10 days from pronouncement for defendant Dumitrescu Cristian and prosecutor and from communication for the other defendants.

Pronounced in the public meeting of 19 April  2007.

PRESIDENT,                                                    COURT CLERK,
*Illegible signature*                                        *Illegible signature*

Drawn by/Typed by B.Ș./12 copies/28 May 2007

Dosar nr. 86/299/2003 (Număr în format vechi 12486/2003)

ROMÂNIA

JUDECĂTORIA SECTORUL 1 BUCUREȘTI
Sentința penală Nr. 1071
Ședința publică de la 19 Aprilie 2007
Completul compus din:
PREȘEDINTE – BIVOLARU ȘTEFANIA
GREFIER – SIGMUND NICOLETA

BANCA TURCO-ROMÂNĂ S.A.
INTRARE / IEȘIRE
NR. ....1215....
DATA ..25.07.200?..

Ministerul Public a fost reprezentat de procuror Lupu Florentina de la Parchetul de pe lângă Judecătoria Sectorului 1 București.

Pe rol pronunțarea cauzei penale privind pe inculpații DUMITRESCU CRISTIAN, KAMURAN CORTUK, ERCELIK MUSTAFA KEMAL, TOBUR MEHMET FAHIM, TULGAR KORAY, YALCINKAYA CETIN FIGEN, YURUKOGLU LEVENT HUSEIN, KONCAVAR MURAT, KAMURAN CORTUK, YALCINKAYA CETIN FIGEN, YURUKOGLU LEVENT HUSEIN, ERCELIK MUSTAFA KEMAL, TULGAR KORAY și pe părțile civile BANCA TURCO ROMÂNĂ S.A., și BANCA TURCO ROMÂNĂ S.A.- PRIN LICHIDATOR FONDUL DE GARANTARE A DEPOZITELOR BANCARE -, având ca obiect falsul intelectual (art. 289 C.p.) art 248 C.p.

Dezbaterile și susținerile în fond au fost consemnate în încheierea de ședință din 11.04.2007, parte integrantă din prezenta, când instanța, având nevoie de timp pentru a delibera și pentru a se depune note scrise, amânat pronunțare la data de 19.04.2007, zi în care a dat prezenta sentință penală:

INSTANȚA

Prin rechizitoriul Parchetului de pe lângă ÎCCJ din data de 01.10.2003 s-a dispus punerea în mișcare a acțiunii penale și trimiterea în judecată a inculpaților Kamuran Cortuk referitor la infracțiunile prevăzute de art. 25 Cod penal raportat la art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal și art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal; Ercelik Mustafa Kemal referitor la art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal; Koncavar Murat ref. la art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal și art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal; Tobur Mehmet Fahim ref. la art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal; Tulgar Koray ref. la art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal; Yalcinkaya Cetin Figen ref. la art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal și art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal; Yurukoglu Levent Husein ref. la art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal, art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal și art. 265 pct.2 Legea 31/1990 cu aplicarea art. 41(2) Cod penal; Dumitrescu Cristian ref. la art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal și art. 31(2) Cod penal raportat la art. 40 din Legea 82/1991, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal.

S-a reținut că în perioada 3 februarie 1998 - 27 octombrie 2000, la solicitarea înc. Kamuran Cortuk, președinte al Companiei Bayindir Insaat Turizm Ticaret ve Sanayi A.S.

1

P4

Turcia şi membru în Consiliul de Administraţie al Băncii Turco-Române ─────── conducerea Băncii Turco-Române S.A. . (respectiv inculpaţii Yurukoglu Levent Husei ─── ─bur Fahim Mehmet - foşti preşedinţi; Tulgar Koray, Ercelik Mustafa Kemal, Koncavar M ─── ─umitrescu Cristian şi Yalcinkaya Cetin Figen, toţi foşti vicepreşedinţi), a constituit şi p ─── ─── fără a aduce la cunoştinţa Consiliului de Administraţie, la un număr de patru bă ─── ─nere străine, plasamente în valută cu caracteristicile iniţiale de depozite la termen, du ─── ─te, în baza unor contracte de garanţie sau de credit a transformat aceste depozite în ─── ─zite colaterale, pentru garantarea unor facilităţi de credit acordate de aceste bănci gr ─── ─── Bayindir Holding.

În faza de urmărire penală s-au administrat ca mijloace de probă declaraţii de martori adrese, precizări şi înscrisuri depuse de către partea civilă, înscrisuri ce emană de la Banca Naţională a României, declaraţii date de către inculpaţi, comunicări de la instituţii bancare, expertiza contabilă.

Prin ordonanţele 00069/10.05.2001 s-a dispus instituirea sechestrului asigurător asupra bunurilor inculpaţilor până la concurenţa sumei de 48.781.104,33USD.

La termenul din data de 02.02.2005 inculpatul Levent Huseyin Yurukoglu prin apără... a invocat excepţia de neconstituţionalitate a dispoziţiilor art. 178(2') C.p.p., iar instanţa prin încheierea de şedinţă din data de 06.04.2005, în temeiul art. 303(6) C.p.p. a dispus suspendarea cauzei până la soluţionarea excepţiei de neconstituţionalitate de către Curtea Constituţională.

Prin decizia nr. 540/18.10.2005 Curtea Constituţională, soluţionând excepţia de neconstituţionalitate a respins-o ca inadmisibilă.

În cauză a fost audiat inculpatul Dumitrescu Cristian (fila 80, vol. III ) care a arătat că nu se face vinovat de săvârşirea faptelor reţinute în sarcina sa, că i s-a adus la cunoştinţă de către ceilalţi acţionari că urmau să se gajeze unele depozite ale băncii în favoarea altor bănci şi deşi iniţial nu a fost de acord, ulterior ca urmare a faptului că i s-a învederat că această operaţiune se va face pe o durată scurtă de timp a semnat un contract prin care se gaja un depozit al băncii pentru garantarea unui credit pe care o bancă austriacă urma să-l acorde grupului Bayindir. A mai precizat că deşi nici unul din depozitele băncii nu sunt semnat partea civilă nu a înregistrat vreun prejudiciu. A mai precizat că într-adevăr aceste depozite sunt de natură colaterală folosite pentru garantarea de credite, însă nu au fost executate de băncile depozitare. În ceea ce priveşte infracţiunea de fals intelectual a arătat că în conformitate cu organigrama BTR nu avea atribuţii de a raporta la BNR situaţia financiară băncii, însă uneori a mai semnat asemenea rapoarte ca urmare a lipsei preşedintelui sau vicepreşedintelui băncii. La momentul intrării în colaps a băncii a aflat de fapt că 110 milioane dolari din cele 150 pe care le ştia ca fiind lichidităţi erau de fapt gajate în favoarea acţionarului principal grupul Bayindir. În rapoartele pe care le-a semnat depozitele figurau ca obişnuite, lipsite de orice sarcini.

Partea vătămată prin lichidator Fondul De Garantare A Depozitelor În Sistemul Bancar în temeiul art. 14 raportat la art. 346 Cod procedură penală s-a constituit parte civilă cu suma de 59.421.921,04 USD şi 11.326.199,99 EUR, cu dobânda legală calculată de la data de 31.03.2003 până la data achitării integrale a debitului.

În faza de cercetare judecătorească au fost audiaţi martorii: Osman Sena, f106, Gheorghe Bogdan, f108, Dobre Carmen, f137, Cioflan Aristide, f139, Şerban Remus Luigi, f162, Şerban Anca, f164, Vinulescu Constantin, f244, Vâlvoi Mocanu Constantin, f335, VOL.III.

Analizând actele şi lucrările dosarului prin prisma susţinerilor părţilor şi a materialului probator administrat în cauză instanţa a reţinut următoarele:
In fapt, la data de 12 februarie 2001, Direcţia Supraveghere din cadrul Băncii Naţionale a României a sesizat Inspectoratul General al Poliţiei cu privire la faptul că Banca Turco-Română S.A.a fost angajată peste limita de expunere prevăzută de normele Băncii Naţionale A României, prin semnarea unor contracte de garantare/finanţare a unor credite acordate de/prin bănci corespondente externe cu capital turcesc din Olanda, Viena, Geneva, Malta, Bahrein şi Cipru de Nord, grupului Bayindir, acţionarul majoritar al băncii.(voL1DUP - filele 41-42).

2

În plus, prin nedepunerea contractelor respective la Banca Turco-Română S.A. şi prin emiterea documentelor de plasare/prelungire a depozitelor respective ca depozite la termen şi nu ca depozite colaterale sau credit, s-a urmărit ascunderea conţinutului economic real al operaţiunilor respective, întocmindu-se în acest fel situaţii financiare (bilanţ, raportări către B.N.R.) nereale. Pentru angajamentele de creditare sau finanţare date în favoarea grupului Bayindir nu au fost constituite garanţii şi nici nu au fost percepute comisioane. Ca urmare a nerambursării creditelor respective de către grupul Bayindir şi imposibilităţii executării unor garanţii (datorită inexistenţei lor), depozitele plasate la Dinamic Bank Of Cyprus, în sumă de 19,9 milioane USD şi 8,8 milioane EURO au fost executate de banca respectivă.

În aceeaşi situaţie se afla şi creditul fiduciar acordat prin Banque Francaise de L'Orient Geneva, în sumă de 30,8 milioane USD, la scadenţa finală din 1 februarie 2001 nu a fost rambursat.

Din documentele intrate în posesia Băncii Naţionale A României a rezultat că semnăturile prin care Banca Turco-Română S.A. a fost angajată în tranzacţiile menţionate au fost date de: Yurukoglu Levent Husein fost preşedinte; Mehmet Fahim Tobur fost preşedinte; Koray Tulgar fost vicepreşedinte; Mustafa Kemal Ercelik fost vicepreşedinte; Murat Koncavar fost vicepreşedinte; Cristian Dumitrescu vicepreşedinte; Figen Yalcinkaya Cetin vicepreşedinte de această situaţie având cunoştinţă Kamuran Cortuk preşedinte al Bayindir Holding A.S. care, în această calitate, a cunoscut că grupul Bayindir e beneficiar al sumelor respective, iar în calitatea lui de membru al Consiliului de Administraţie al Băncii Turco-Române S.A. a aprobat un bilanţ nereal, fals.

Sesizarea Băncii Naţionale a României s-a bazat şi pe raportul întocmit de către Direcţia Supraveghere privind situaţia financiară şi prudenţială a Băncii Turco-Române S.A. la data de 31 ianuarie 2001 (vol.1 - filele 43-57), prin care s-a propus atît deschiderea procedurii falimentului, cît şi retragerea autorizaţiei de funcţionare a Băncii Turco-Române S.A.

Conform statutului B.T.R. Consiliul de Administraţie avea ca atribuţii conform art.13 întocmirea bilanţului contabil şi contul de profit şi pierderi şi propune Adunării Generale a Acţionarilor destinaţia profitului (lit.a); propune Adunării Generale a Acţionarilor bugetul de venituri şi cheltuieli pentru următorul exerciţiu financiar" (lit.b); stabileşte politica BĂNCII privind resursele, creditele şi dobînzile(lit.k); aprobă veniturile şi cheltuielile BĂNCII, investiţiile proprii (...)(lit.l); decide asupra constituirii de garanţii asupra activelor BĂNCII, în limita admisă de lege şi prezentul Statut (lit.x).

De asemenea, în art.15 se stipulează că "Preşedintele angajează BANCA potrivit sarcinilor, responsabilităţilor şi împuternicirilor stabilite de Consiliul de Administraţie al Băncii" şi că "atribuţiile şi competenţele vicepreşedinţilor se stabilesc de Consiliul de Administraţie al băncii, la propunerea Preşedintelui băncii".

În art.16 se precizează că "activităţile desfăşurate de bancă vor crea obligaţii din punct de vedere legal doar dacă vor purta semnătura a cel puţin doi conducători a căror poziţie va fi specificată în lista semnăturilor autorizate aprobată de Comitetul de Direcţie."

Dispoziţiile art. 12 din Statut prevăd că "pentru valabilitatea deciziilor Consiliului de Administraţie este necesară prezenţa a cel puţin jumătate din numărul administratorilor iar deciziile Consiliului de Administraţie se iau cu majoritatea absolută a membrilor prezenţi" şi că "membrii Consiliului de Administraţie sînt răspunzători, conform legii, pentru îndeplinirea tuturor obligaţiilor lor, aşa cum sînt menţionate în mandatul pe care îl deţin." Vol.3 DUP filele 332 – 334.

La data de 22 decembrie 1993, BTR a fost înregistrată la Oficiul Registrului Comerţului al Municipiului Bucureşti cu nr. de înmatriculare J/40/28153/1993 (vol.3 - fila 299) iar în luna august 2000, pe teritoriul României, BTR avea 18 filiale.

Acţionarii acesteia erau o persoană fizică şi patru persoane juridice, din rîndul acestora din urmă detaşîndu-se Bayindir Holding A.S., cu un aport de capital de 219.456.000.000 lei (din 345.600.000.000 lei), un număr de acţiuni de 219.456.000 (din totalul de 345.600.000) şi o participaţie la beneficii/pierderi de 63.5000% (vol.3 - fila 310).

Obiectul de activitate al BTR cuprindea prestarea de servicii bancare comerciale şi de investiţii către persoane fizice şi juridice, colectarea depozitelor în lei şi în valută,

3



acordarea de credite pe termen scurt, mediu și lung și efectuarea oricăror alte oper[...]
bancare asociate cu operațiunile de import-export: emiterea și gestiunea instrumentelor d[...]
plată și de credit; plăți și decontări; transferuri de fonduri; emiterea scrisorilor de garanție[...]
confirmarea scrisorilor de garanție, vânzarea sau cumpărarea de cecuri emise de BTR sau[...]
de altă bancă străină, consultanță bancară (vol. 2- filele 342 -343).

La data de 8 ianuarie 1997, cu ocazia Adunării Generale Extraordinare a Acționarilor de la
BTR Yurukoglu Levent Husein a fost numit în funcțiile de președinte al Consiliului de
Administrație și președinte executiv al B.T.R. (vol.3 - fila 322). La data de 4 martie 1997, cu
ocazia Adunării Generale Extraordinare a Acționarilor BTR inc.Koncavar Murat a fost numit
în funcțiile de vicepreședinte al Consiliului de Administrație și vicepreședinte executiv al
B.T.R. S.A. (vol.3 - fila 321).La data de 8 aprilie 1997, la sediul BTR a avut loc Adunarea
Generală a Acționarilor, avînd ca ordine de zi modificarea componenței Consiliului de
Administrație al BTR (vol.3 - fila 312). Astfel, numărul membrilor Consiliului de Administrație
s-a modificat de la 7 membri la 9 membri, din noua structură făcînd parte inculpații Yurukoglu
Levent Husein (presedinte), Dumitrescu Cristian, Koncavar Murat și Yalcinkaya Cetin Figen,
vicepreședinți.

La data de 3 mai 2000, cu ocazia Adunării Generale Ordinare a Acționarilor BTR a fost
aprobată numirea inc.Tobur Fahim Mehmet în funcțiile de președinte al B.T.R. și președinte
al Consiliului de Administrație al Băncii. De asemenea, a fost aprobată numirea inc. Tulgar
Koray în funcțiile de vicepreședinte al B.T.R., respectiv vicepreședinte al Consiliului de
Administrație al Băncii (vol 1 DUP1- fila 294-295). La data de 20 iunie 2000, cu ocazia
Adunării Generale Ordinare a Acționarilor de la BTR, inc.Ercelik Mustafa Kemal a fost numit
în funcțiile de vicepreședinte al Consiliului de Administrație și vicepreședinte executiv al
B.T.R.

În perioada 03.02.1998-27.10.2000 conducerea BTR a constituit, iar ulterior a
prelungit, fără a aduce la cunoștința acestuia, la patru bănci străine partenere, plasamente în
valută care deși inițial aveau destinația de depozite la termen, ulterior, în baza unor contracte
de garanție sau de credit li s-a schimbat această destinație devenind depozite colaterale
pentru garantarea unor facilități de creditare acordate grupului Bayindir Holding, al cărui
președinte era inculpatul Kamuran Cortuk, membru în Consiliul de Administrație al BTR.
Totodată aceste depozite deși trebuiau înregistrate în conturile 1313 și 901 (ca depozite
colaterale sau angajamente la alte bănci) erau în mod nereal înregistrate în contul 1312,
depozite la termen. Tot în mod eronat au fost raportate și BNR-ului întrucât în caz contrar s-[...]
ar fi reținut că încalcă normele privind indicatorii de prudențialitate care trebuiau în mod
periodic calculați și raportați la BNR. Băncile străine la care s-au efectuat în acest interval
plasamente în valută și valoarea depozitelor colaterale constituite sunt relevate în cuprinsul
raportului de expertiză contabilă (vol. 2 DUP- filele 92-93).

Ca urmare a demersurilor făcute la nivelul băncilor străine la care s-au constituit
aceste plasamente (Es Bank Ag Viena, Finansbank Holland Suisse, Banque Francaise De
L'Orient, Demirbank), f180-182, vol.1, a reieșit natura juridică reală a fiecărui depozit în parte,
astfel: Finansbank Holland Suisse a comunicat că suma de 10 milioane de dolari a fost
folosită drept depozit colateral, conform instrucțiunilor BTR; Demirbank a comunicat că
depozitele de 35 mil. dolari și 8,8 mil. euro au fost transferate la Dinamic Bank of Cyprus,
care la rândul ei a învederat că acestea erau depozite colaterale.

Cu toate că procedura de urmat era ca pentru aceste plasamente care constituiau
garanții sau credite să se constituie garanții reale și să se achite comisioane, grupului
Bayindir nu i s-au solicitat asemenea garanții cu scopul de nu se putea determina natura
reală a cestor sume și de a nu permite identificarea acestora. Astfel, la f43 vol1 se află
raportul privind situația financiară și prudențială a BTR la data de 31.01.2001 întocmit de
către BNR din care reiese că în urma verificărilor "s-a constatat că BTR nu a solicitat
constituirea de garanții pentru angajamentele date și nu a perceput comisioane la aceste
angajamente în scopul de a nu permite identificarea acestora ca depozite colaterale și de a
induce în eroare asupra naturii reale a acestor sume".

Conform aceluiași raport enunțat mai sus s-a reținut că BTR a calculat și transmis
BNR un nivel nereal al fondurilor proprii iar prin aceasta a denaturat conținutul raportărilor de

P7

prudență bancară încălcându-se dispozițiile art. 69 L 58/1998. la data de 31.12.2000 toți indicatorii de prudență bancară calculați în funcție de fondurile proprii ale băncii s-au situat în afara limitelor reglementate, devenind irelevanți. Ca urmare a crizei de lichiditate BTR nu a fost în măsură să-și îndeplinească obligațiile stabilite de către BNR prin Regulamentul nr 4/1998, respectiv constituirea rezervei minime obligatorii la nivelul prevăzut. Tot ca urmare a aceleiași crize BTR a înregistrat situații în care instrumentele de debit nu au fost onorate integral, în termen de cel puțin 30 zile de la data debitării contului clientului. S-a concluzionat că BTR se încadrează la data de 31.01.2001 în prevederile art. 2(1) lit."a" L83/1998 privind procedura falimentului bancar „ o bancă este considerată insolvabilă dacă.........nu a onorat integral creanțe certe, lichide și exigibile în termen de cel puțin 30 zile".

Consecința celor constatate a fost aceea de a se propune deschiderea procedurii falimentului BTR și retragerea autorizației de funcționare a acesteia, finalizată cu declanșarea acestei proceduri.

În consecință față de considerentele ce preced instanța reține că deși nu existau reglementări interne ale BTR privind posibilitatea constituirii de depozite colaterale la alte bănci în străinătate s-au efectuat asemenea plasamente fără a exista vreo solicitare scrisă din partea grupului Bayindir însoțită de o documentație aferentă prevăzută de altfel de normele bancare, fără ca aceste plasamente să fie discutate în Consiliul de Administrație și a probată ca atare și fără a se emite scrisori de garanție bancară. În ceea ce privește contractele încheiate instanța a reținut următoarele:

Astfel, în perioada 23 iulie 1999 - 26 iulie 1999, inculpații Yurukoglu Levent Husein și Koncavar Murat, președinte și respectiv vicepreședinte ai BTR au semnat și transmis Sucursalelor Malta și Bahrain ale Demirbank, 14 contracte angajament care (vol.2 - filele 112-131; 133-136; 138-139) .

Așa cum reiese din conținutul celor 14 contracte, având în vedere facilitatea de credit acordată lui Bayindir Insaat Turizm Ticaret Ve Sanay A.S., începând de la data utilizării până la scadența finală BTR a acceptat irevocabil și necondiționat ca investițiile sale pe piața monetară către aceste sucursale să constituie garanții valabile pe durata facilitării de credit către Bayindir Insaat Turizm Ticaret Ve Sanay A.S.

Totodată s-a angajat să plătească sume de dobîndă semestriale, datorate către aceste bănci, conform acestei facilități, dacă rămîn neplătite de către Bayindir Insaat Turizm Ticaret Ve Sanay A.S. La scadența finală a facilității de credit, dacă suma principalului nu este plătită împreună cu dobînda acumulată, BTR autoriza aceste bănci să-și lichideze contul, din investiția sa pe piața monetară. Dobînda se va acumula lunar.

Practic, diferența de conținut între cele 14 contracte-angajament constă din valoarea garanției constituite (valoarea depozitului), termenele și dobînda percepută pentru creditul acordat. Sumele totale ale garanțiilor BTR pentru fa cilitățile - de credit acordate de Demirbank companiei Bayindir Insaat Turizm Ticaret Ve Sanay A.S. au fost de 34.950.000 USD, din care la sucursala Malta 12.000.000 USD și la sucursala Bahrain 22.950.000 USD; 6.800.000 EUR la sucursala Malta; 4.000.000 DEM, la sucursala Malta.

I.La data de 23 iunie 1999 inculpații Yurukoglu Levent Husein și Koncavar Murat au semnat și transmis sucursalei Bahrain a Demirbank contractul-angajament privind facilitatea de credit de 4 mil. USD acordată de aceasta grupului Bayindir pe o durată de 1 an și o săptămînă, începînd de la data utilizării, pînă la scadenta finală din data de 4 iulie 2000, cînd banca străină era autorizată să lichideze contul din investiția pe piața monetară, cu valoarea creditului nerambursat, împreună cu dobînda acumulată (vol.2 DUP - filele 107-108 )

Depozitul la termen în valoare de 4.000.000 USD constituit la această bancă pe perioada 24 iunie - 26 iulie 1999 și înregistrat în contabilitatea BTR în contul 1312 ca depozit la termen la bănci", cu NC DY 28 - SLIP 26546 din 24 iunie 1999 (vol.2 DUP - fila 110) a fost transformat în depozit colateral începînd cu data de 26 iulie 1999 constituind garanție, conform contractului-angajament din 23 iunie 1999 pentru facilitatea de credit acordată de Demirbank pentru Bayindir.

II.La data de 24 iunie 1999, inculpații Yurukoglu Levent Husein și Koncavar Murat au semnat și transmis sucursalei Bahrain a Demirbank contractul-angajament referitor la

5



facilitatea de credit pentru suma de 5.000.000 USD acordată de această companiei Ba yir
cu durata de 1 an şi o săptămînă, începînd de la data utilizării pînă la scadenta finală din
iulie 2000 (vol.2DUP - filele 112-113 ), prin care banca străină era autorizată să lichideze
contul din investiţia pe piaţa monetară, cu valoarea creditului nerambursat împreună cu
dobînda acumulată.Depozitul la termen în valoare de 5.000.000 USD constituit la această
bancă pe perioada 23 iunie 1999 - 23 iulie 1999 şi înregistrat în contabilitatea BTR în contul
1312 "Depozite la termen la bănci" cu NC DY 29-SLIP 26502 din 23 iunie 1999 (vol.2DUP -
fila 110 ) a fost transformat în depozit colateral, începînd cu data de 23 iulie 1999, constituind
garanţie, conform contractului-angajament din 24 iunie 1229, pentru facilitatea de credit
acordată de Demirbank companiei Baylndir.

III.La data de 30 iunie 1999,  aceiaşi inculpaţi au semnat şi transmis sucursalei Malta
contractul-angajament referitor la facilitatea de credit de 5 mil USD cordată de aceasta
grupului Bayindir pe o durată de 1 an şi o săptămînă, începînd de la data utilizării pînă la
scadenta finală, 7 iulie 2000 (vol. 2 DUP- filele 114-115 ), prin care aceasta era autorizată să
lichideze contul din investiţia pe piaţa monetară cu valoarea creditului nerambursat de
Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 5.000.000 USD constituit la Demirbank pe perioada
29 iunie 1999 - 29 iulie 1999 şi înregistrat în contabilitatea BTR în contul 1312 "Depozite la
termen la bănci" cu NC DY 26/SLIP 2666 din 29 iunie 1999 (vol. 2 DUP- fila 110) a fost
transformat în depozit colateral începînd cu data de 31 iulie 1999, constituind garanţie,
conform contractului-angajament din 30 iunie 1999, pentru facilitatea de credit acordată de
Demirbank companiei Baylndir.

IV.La data de 8 iulie 1999, aceiaşi inculpati au semnat şi transmis sucursalei
Bahrain a Demirbank un contract-angajament referitor la facilitatea de credit de1.000.000
USD acordată de aceasta companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd
de la data utilizării şi pînă la scadenţa finală din 17 iulie 2000 (vol. 2DUP - filele 116-117),
banca străină fiind autorizată să lichideze contul de investiţi  pe piaţa monetară cu valoarea
creditului nerambursat de Bayindir  împreună cu dobînda acumulată.

Depozitul la termen în valoare de 1.000.000 USD constituit la Demirbank pe perioada
7 iulie 1999 - 12 august 1999 şi înregistrat în contabilitatea BTR în contul 1312 "Depozite la
termen la bănci" cu NC DY 26/SLIP 26936 din 7 iulie 1999 (vol. 2DUP - fila 110 ) a fost
transformat în depozit colateral, începînd cu data de 11 august 1999 constituind garanţie,
conform contractului-angajament din 8 iulie 1999 pentru facilitatea de credit acordată de
Demirbank companiei Baylndir.

V.La data de 19 iulie 1999, inculpatii Yurukoglu Levent Husein şi Koncavar Murat au
semnat şi transmis sucursalei Bahrain a Demirbank un contract-angajament privind facilitatea
de credit  de 3.000.000 USD acordată de aceasta Companiei Bayindir cu o durată de 1 an şi
o săptămînă, începînd de la data utilizării pînă la scadenta finală din 27 iulie 2000 (vol. 2DUP
- filele 118-119), banca străină fiind autorizată să lichideze contul din investiţia pe piaţa
monetară cu valoarea creditului nerambursat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 3.000.000 USD constituit la Demirbank pe perioada
16 iulie 1999 - 19 august 1999 şi înregistrat în contabilitatea BTR în contul 1312 "Depozite la
termen la bănci" cu NC DY 29/SLIP 27302 din 16 iulie 1999 (vol.2DUP- fila 110) a fost
transformat în depozit colateral începînd cu data de 19 august 1999, constituind  garanţie,
conform contractului angajament din 19 iulie 1999, pentru facilitatea de credit acordată de
Demirbank Companiei Baylndir.

VI.La data de 21 iulie 1999, inculpatii Yurukoglu Levent Husein şi Koncavar Murat au
semnat şi transmis Sucursalei Bahrain a Demirbank contractul-angajament privind facilitatea
de credit de 4 mil. USD acordată de aceasta Companiei Bayindir  pe o durată de 1 an şi o
săptămînă, începînd cu data utilizării pînă la scadenta finală din 3 august 2000 (vol. 2DUP-
filele 120-121),  banca străină fiind autorizată să lichideze contul din investiţia pe piaţa
monetară cu valoarea creditului nerambursat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 4.000.000 USD constituit la Demirbank pe perioada
20 iulie 1999 - 20 august 1999  înregistrat în contabilitatea BTR în contull  1312 "Depozite la
termen la bănci" cu NC DY 117/SLIP 27414 din 20 iulie 1999 (vol. 2DUP - fila 110) a fost

P9

transformat în depozit colateral începînd cu data de 20 august 1999, constituind garanţie, conform contractului-angajament din 21 iulie 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir.

VII.La data de 2 iulie 1999, inculpaţii Yurukoglu Levent Husein şi Koncavar Murat au semnat şi transmis Sucursalei Malta a Demirbank contractul-angajament referitor la facilitatea de credit de 2 mil USD acordată Companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd cu data utilizării pînă la scadenţa finală din 10 iulie 2000 (vol. 2 DUP filele 122-123), banca străină fiind autorizată să lichideze contul din investiţia pe piaţa monetară cu valoarea creditului nerambursat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 2.000.000 USD constituit la Demirbank pe perioada 1 iulie 1999 - 2 august 1999 şi înregistrat în contabilitatea BTR în contul 1312 cu NC DY 30/SLIP 26782 din 1 iulie 1999 (vol. 2 - fila 110) a fost transformat în depozit colateral începînd cu data de 2 august 1999, constituind garanţie, conform contractului-angajament din 7 iulie 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir.

VIII. La data de 29 iunie 1999, aceiaşi inculpaţii au semnat şi transmis Sucursalei Malta a Demirbank contractul-angajament privind facilitatea de credit de 5 mil USD acordată de aceasta Companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd de la data utilizării pînă la scadenţa finală din 6 iulie 2000 (vol. 2 - filele 124-125), banca străină fiind autorizată să lichideze contul din investiţia pe piaţa monetară cu valoarea creditului nerambursat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 5.000.000 USD constituit la Demirbank pe perioada 28 iunie 1999 - 28 iulie 1999 şi înregistrat în contabilitatea BTR în contul 1312 cu NC DY 30/SLIP 26638 din 28 iunie 1999 (vol. 2 - fila 110 ) a fost transformat în depozit colateral începînd cu data de 28 iulie 1999, constituind garanţie, conform contractului-angajament din 29 iunie 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir.

IX.La data de 9 iulie 1999, aceiaşi inculpaţi au semnat şi transmis sucursalei Malta a Demirbank contractul-angajament privind facilitatea de credit de.2.150.000 USD acordată de aceasta companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd de la data utilizării şi pînă la scadenţa finală din 18 iulie 2000 (vol. 2- filele 126-127), cînd aceasta era autorizată să lichideze contul din investiţia pe piaţa monetară a BTR cu valoarea creditului nerambursat de Bayindir împreună cu dobînda acumulată. Depozitul la termen în valoare de 2.150.000 USD constituit la DEMIRBANK pe perioada 8 iulie 1999 - 12 august 1999 şi înregistrat în contabilitatea BTR în contul1312 cu NC DY 22/SLIP 26988 din 8 iulie 1999 (vol. 2- fila 110) a fost transformat în depozit colateral începînd cu data de 12 august 1999 constituind garantie, conform contractului-angajamnt din 9 iulie 1999 pentru facilitatea de credit acordată de Demirbank companieiBayindir.

X.La data de 15 iulie 1999, cei doi inculpaţi au semnat şi transmis Sucursalei Malta a Demirbank contractul-angajament privind facilitatea de credit de 3.800.000 USD acordată de aceasta Companiei Bayindir pe o durată de 1 an şi o săptămînă,începînd de la data utilizării pînă la scadenţa finală din 24 iulie 2000 (vol. 2 - filele 128-129), cînd banca străină era autorizată să lichideze contul din investiţia pe piaţa monetară a BTR cu valoarea creditului nerambursat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 3.800.000 USD constituit la Demirbank pe perioada 14 iulie 1999 - 16 august 1999 şi înregistrat în contabilitatea BTR în contul 1312 "Depozite la termen la bănci" cu NC DY 33/SLIP 27199 din 14 iulie 1999 (vol. 2 - fila 110 ) a fost transformat în depozit colateral începînd cu data de 16 august 1999, constituind garanţie, conform contractului-angajament din 5 iulie 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir.

XI.La data de 19 iulie 1999, cei doi inculpaţi au semnat şi transmis Sucursalei Malta Demirbank contractul-angajament privind facilitatea de credit de 3.300.000 EUR acordată de aceasta Companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd de la data utilizării pînă la scadenţa finală din 26 iulie 2000 (vol. 2 - filele 130-131), cînd aceasta era autorizată să lichideze contul din investiţia pe piaţa monetară a BTR cu valoarea creditului nerambursat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 3.300.000 EUR constituit la Demirbank pe perioada

6 iulie 1999 - 16 august 1999 şi înregistrat în contabilitatea BTR cont 1312 cu NC DY 2/ 27253 din 16 iulie 1999 (vol. 2 - fila 132) a fost transformat în depozit colateral începînd data de 17 iulie 1999, constituind garanţie, conform contractului-angajament din 19 i 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir.

XII. La data de 21 iulie 1999, aceiaşi inculpati au semnat şi transmis Sucursalei Malta a Demirbank contractul-angajament privind facilitatea de credit de 500.000 EUR acordată de aceasta Companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd de la data utilizării şi pînă la scadenţa finală din 1 august 2000 (vol. 2 - filele 133-134), cînd banca străină era autorizată să lichideze investiţia pe piaţa monetară cu valoarea creditului neramburat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 500.000 EUR constituit la Demirbank pe perioada 19 iulie 1999 - 18 august 1999 şi înregistrat în contabilitatea BTR contul 1312 cu NC DY 2/SLIP 27308 din 19 iulie 1999 (vol. 2 - fila 132) .a fost transformat în depozit colateral începînd cu data de 18 august 1999, constituind garanţie, conform contractului-angajament din 21 iulie 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir.

XIII. La data de 21 iulie 1999, inculpatii au semnat şi transmis Sucursalei Malta Demirbank contractul angajament privind facilitatea de credit pentru suma de 4 mil DEM acordată de aceasta Companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd de la data utilizării pînă la scadenţa finală din 2 august 2000 (vol. 2 - filele 135-136), cînd banca străină era autorizată să lichideze contul din investiţia pe piaţa monetară a BTR cu valoarea creditului neramburat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 4.000.000 DEM constituit la Demirbank pe perioada 19 iulie 1999 - 18 august 1999 înregistrat în contul1312 "Depozite la termen la bănci" cu NC DY /SLIP 27305 din 19 iulie 1999 (vol. 2 - fila 137) a fost transformat în depozit colateral începînd cu data de 18 august 1 constituind garanţie, conform contractului-angajament din 21 iulie 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir.

XIV. La data de 19 iulie 1999, inculpatii Yurukoglu Levent Husein şi Koncavar Murat au semnat şi transmis Sucursalei Malta Demirbank contractul-angajament privind facilitatea de credit de 3 mil. EUR acordată de aceasta Companiei Bayindir pe o durată de 1 an şi o săptămînă, începînd de la data utilizării pînă la scadenţa finală din 3 august 2000 (vol. 2 - filele 138-139), cînd banca străină era autorizată să lichideze contul din investiţia pe piaţa monetară a BTR cu valoarea creditului neramburat de Bayindir împreună cu dobînda acumulată.

Depozitul la termen în valoare de 3.000.000 EUR constituit la Demirbank pe perioada 26 iulie 1999 - 26 august 1999 şi înregistrat în contul 1312 "Depozite la termen la bănci" cu NC DY 2/SLIP 27570 din 26 iulie 1999 (vol. 2 - fila 132) a fost transformat în depozit colateral începînd cu data de 17 august 1999, constituind garanţie, conform contractului-angaja nt din 19 iulie 1999, pentru facilitatea de credit acordată de Demirbank Companiei Bayindir. Transferul s-a efectuat în baza contractului de girare în valoare de 22.000.000 USD (vol. 2 - filele 197-198) semnat cu această bancă la data de 4.09.2000 de conducătorii BTR Tobur Mehmet Fahim – preşedinte şi Tulgar Koray - vicepreşedinte.

Prin transferarea drepturilor asupra garanţiei, în sumă de 22.000.000 USD către Dinamic Bank, nu s-a creat un risc sau prejudiciu suplimentar prin aceasta, avînd în vedere caracterul irevocabil şi necondiţionat al garanţiilor instituite încă în iulie 1999 pe depozitele BTR de la Demirbank, s-a evitat temporar executarea depozitelor de către Demirbank.

În baza SLIP deal-ului nr.44519 şi a notei contabile nr.DY 6 din 4 octombrie 2000 (vol. 2 - filele 199-200), suma de 22.000.000 USD a fost transferată la Demirbank şi plasată la Dinamic Bank pe perioada 4 octombrie 2000 - 6 noiembrie 2000, cu o dobîndă de 12%, adică 242.000 USD.

Dinamic Bank a confirmat prin telex valoarea depozitului, perioada, precum ş procentul de dobîndă (vol. 2 -fila 201). Plasamentele prezentate la punctele VII-X, în valoare totală de 12.950.000 USD, constituie garanţii pentru facilitaţile acordate de Demirbank Sucursala Bahrain, în sumă de 7.000.000 USD şi de Demirbank Sucursala Malta, în sumă de 5.950.000 USD, Companiei Bayindir, s-au transferat în totalitate la Dinamic Bank Offshore LTD Lefkosa.

8

Transferul, în valoare de 13.000.000 USD s-a efectuat în baza contractului (angajament) de girare semnat de această bancă la data de 29.09.2000 de conducătorii BTR Tobur Mehmet Fahim, Ercelik Mustafa Kemal.

Deoarece scadenta finală a celor 4 contracte de garanţie, semnate de Yurukoglu Levent Husein-preşedinte şi Koncavar Murat vicepreşedinte, se împlinise încă din luna iulie 2000, iar creditele folosite de către Bayindir nu au fost rambursate, Demirbank urma să treacă la executarea acestor garanţii, gajurile avînd caracter irevocabil şi necondiţionat.

În aceste condiţii, alternativa de urmat de BTR pentru ca Demirbank să nu execute garanţiile era prelungirea termenelor scadenţei a garanţiilor pentru o perioadă scurtă, care să ofere grupului de firme Bayindir timpul necesar achitării creditului. În consecinţă, contractele de garanţie deja existente şi ajunse la maturitate, s-au transferat în beneficul, Dinamic Bank prin încheierea angajamentului de girare semnat de conducerea băncii aflată în funcţie la data de 29.09.2000.

În conţinutul documentului de angajament în valoare de 13.000.000 USD (vol. 2- fila 202), prin care s-au prelungit termenele de scadenţă a contractelor de garanţie, se face referire la obiectul garanţiei şi valoarea contractelor iniţiale. Prin transferarea drepturilor asupra garanţiei în sumă de 13.000.000 USD către Dinamic Bank nu s-a creat un risc sau prejudiciu suplimentar, prin aceasta, avînd în vedere caracterul irevocabil şi necondiţionat al garanţilor instituite încă din iunie şi iulie 1999 pe depozitele BTR de la Demirbank, s-a evitat temporar executarea depozitelor de către banca creditoare.

În baza SLIP deal-ului nr.45427 şi a notei contabile nr.DY 12 din 31 octombrie 2000 (vol. 2- filele 203-204), suma de 13.000.000 USD a fost transferată de la Demirbank şi plasată la Dinamic Bank pe perioada 30 octombrie 2000 - 30 noiembrie 2000, cu o dobîndă de 12%, adică 134.333,33 USD. Dinamic Bank a confirmat prin telex valoarea depozitului, perioada, precum şi procentul de dobîndă (vol. 2 -fila 205). Plasamentele prezentate la punctele XI-XIII, în valoare totală de 3.800.000 EUR şi 4.000.000 DEM, constituite în garanţie pentru facilitaţile acordate de Demirbank Sucursala Malta, către Bayindir s-au transferat în totalitate la Dinamic Bank Lefkosa.

Transferul, în valoare de 5.800.000 EUR, s-a efectuat în baza contractului de angajament (vol. 2- fila 206) semnat cu banca la data de 29.09.2200 de conducătorii BTR Tobur Mehmet Fahim – preşedinteşi Tulgar Koray - vicepreşedinte.

Deoarece scadenţa finală a 3 contracte de garanţie, semnate de Yurukoglu Levent Husein-preşedinte şi Koncavar Murat vicepreşedinte, se împlinise încă de la sfîrşitullunii iulie 2000, iar creditele folosite de către Bayindir nu au fost rambursate, Demirbank urma să treacă la executarea acestor garanţii, gajurile avînd caracter irevocabil şi necondiţionat.

În aceste condiţii, singura alternativă de urmat de BTR pentru ca Demirbank să nu execute garanţiile, era prelungirea termenelor de scadenţă a garanţiilor pentru o perioadă scurtă, care să ofere grupului de firme Bayindir timpul necesar achitării creditului.

În consecinţă contractele de garanţie deja existente şi ajunse la maturitate au fost transferate în beneficiul Dinamic Bank Offshore LTD Lefkosa, prin încheierea angajamentului de girare semnat de conducerea băncii aflată în funcţie la data de 29.09.2000.

În conţinutul documentului de angajament în valoare de 5.800.000 EUR (vol. 2- fila 206), prin care s-au prelungit termenele de scadenţă a contractelor de garanţie pînă la data de 30.11.2000, se fac menţiuni referitoare la obiectul garanţiei şi valoarea contractelor iniţiale.

Prin transferarea drepturilor asupra garanţiei, în sumă de 5.800.000 EUR către Dinamic Bank nu s-a creat un risc sau prejudiciu suplimentar, prin aceasta, avînd în vedere caracterul irevocabil şi necondiţionat al garanţiilor instituite încă în Iunie şi iulie 1999 pe depozitele BTR de la Demirbank, s-a evitat temporar executarea depozitelor de către banca creditoare.

În baza SLIP deal-ului nr.45430 şi notei contabile nr.DY 13 din 31 octombrie 2000 (vol. 2 - filele 207-208), suma de 5.800.000 EUR a fost transferată de la Demirbank şi plasată la Dinamic Bank pe perioada 30 octombrie 2000 - 30 noiembrie 2000 cu o dobîndă de 12%,

9

P12

adică 59.933,33 EUR .

Dinamic Bank a confirmat prin telex valoarea depozitului, perioada, precum procentul de dobîndă (vol. 2- fila 209). Plasamentul prezentat la punctul 14, în valoare totă de 3.000.000 EUR, constituit drept garanție pentru facilitatea acordată de Demirban Sucursala Malta Companiei Bayindir s-a transferat în totalitate la Dinamic Bank Offshore LTD. Lefkosa, în baza contractului de girare (val. 2 - filele 210-211), semnat cu banca la 4.09.2000 de către Tobur Mehmet Fahim-președinte și Tulgar Koray-vicepreședinte.

Deoarece contractul de garanție semnat de Yurukoglu Levent Husein-președinte și Koncavar Murat -vicepreședinte, ajunsese la scadența finală încă de la data de 3 august 2000, iar creditele folosite de către Bayindir nu au fost rambursate, Demirbank nu mai putea amîna executarea acestor garanții, gajurile avînd caracter irevocabil și necondiționat.

În aceste condiții, alternativa de urmat de BTRR, pentru ca Demirbank  să nu execute garanțiile, era prelungirea termenelor de scadență a garanțiilor pentru o perioadă scurtă, care să ofere grupului de firme Bayindir timpul necesar achitării creditului.

Prin transferarea depozitului asupra garanției, în sumă de 3.000.000 EUR, către Dinamic Bank nu s-a creat un risc sau prejudiciu suplimentar, prin aceasta, avînd în veden caracterul irevocabil și necondiționat al garanției instituite din iulie 1999 pe depozitul Băncii Turco-Române de la Demirbank, ci s-a evitat temporar executarea depozitelor de către banca creditoare.

În baza SLIP deal-ului nr.45434 și notei contabile nr.DY 14 din octombrie 2000 (vol. 2 - filele 212-213), suma de 3.000.000 EUR a fost transferată de la Demirbank și plasată la Dinamic Bank pe perioada 4 octombrie 2000 - 3 noiembrie 2000, cu o dobîndă de 12%.

În perioada februarie 1998 - august 1999, BTR  a efectuat la Finansbank - Sucursalele din Geneva și Amsterdam plasamente în sumă totală de 14.000.000 USD.

I.Astfel, la data de 4 februarie 1998, inculpații Yurukoglu Levent Husein, Dumitrescu Cristian, președinte și respectiv vicepreședinte ai BTR au semnat și transmis Finansbank Suisse SA Geneva adresa prin care se angaja irevocabil și acceptă blocarea sumei de 4.000.000 USD plasată ca depozit la termen, la data de 3 februarie 1998, pentru garantarea creditelor pe care aceasta urma să le acorde Companiei Bayindir (vol2 - fila 159).

Depozitul la termen în valoare de 4.000.000 USD constituit la Finansbank- și înregistrat în contabilitatea BTR în cont 1312 "Depozite la termen la bănci" cu nota contabilă nr.DY 24/SLIP nr.12050 din 3 februarie 1998, a devenit, începînd cu data de 4 februarie, 1998, depozit colateral, drept garanție pentru facilitatea de credit acordată de către această bancă pentru Bayindir Group Companies.

II.La data de 4 august 1999, inculpații Koncavar Murat și Yalcinkaya Cetin Figen, vicepreședinți BTR au încheiat cu Finansbank Olanda NV Amsterdam actul juridic denumit "titlu de girare a depozitului" (vol. 2- filele 160-161)  cu privire la investiția pe piața monetară a sumei de 700.000 USD pe perioada 5 august 1999 - 6 septembrie 1999, precizînd că această investiție va fi reînnoită lunar. În acest document se stipulau următoarele: "Noi, Banca Turco-Română S.A., acceptăm în mod irevocabil și necondiționat prin prezentul document ca investiția noastră pe piața monetară ... va servi drept colateral pentru acordarea unui împrumut de către banca dumneavoastră către Bayindir Insaat Turizm Ticaret Ve San. A.S. pe perioada 6 august 1999 -10 august 2000.

Sîntem de acord să împrumute această sumă la Bayindir Insaat Turizm Ticaret Ve San. A.S. drept capital circulant.

În cazul în care Bayindir Insaat Turizm Ticaret Ve San. A.S. nu își îndeplinește obligațiile către FINANSBANK (HOLLAND) N.V. conform facilităților de credit FINANSBANK (HOLLAND) N. V. este autorizată în mod irevocabil și necondiționat prin prezentul document să utilizeze depozitul nostru pentru a stinge, rambursa obligațiile lui BAYINDIR INSAAT TURIZM TICARET VE SAN. A.S.

Acestui contract i se vor aplica în întregime termenii și condițiile generale  ale Asociației Bancherilor Olandezi, după cum sînt depuse la Curtea din Amsterdam.

Acest contract și drepturile părților privind acesta va fi întocmit în conformitate cu și va fi guvernat de legile din Olanda. Orice acțiune sau procedură legală la acest contract va fi adusă în fața curților olandeze din jurisdicția Amsterdam."

Case 18-01651-CMG   Doc 30-3   Filed 04/16/19   Entered 04/16/19 13:51:52   Desc
Case 17-34019-CMG   Claim 3-1   Filed 04/05/18   Desc Main Document   Page 50 of 64

Exhibit A   Page 44 of 58

Depozitul la termen în valoare de 7.000.000 USD constituit la Finansbank și înregistrat în contabilitatea BTR în contul 1312 "Depozite la termen la bănci" cu Nota contabilă nr.DY 24/SLIP nr.28150 din 4 august 1999 a devenit, începînd cu aceeași dată, depozit colateral, cu titlu de garanție pentru facilitatea de credit acordată de această bancă Companiei Bayindir.

III.La data de 10 august 1999, inculpații Yurukoglu Levent Husein și Koncavar Murat președinte și respectiv vicepreședinte ai BTR au încheiat cu Finansbank Olanda NV Amsterdam contractul "Titlu De Girare A Depozitului" (vol. 2 -fila 162), cu privire la investiția pe piața monetară a sumei de 3.000.000 USD pe perioada 9 august 1999 - 9 septembrie 1999 stipulîndu-se că această investiție va fi reînnoită lunar, fără a se face mișcări de fonduri pentru suma principalului.

De asemenea, BTR accepta, în mod irevocabil și necondiționat ca investiția de 3.000.000 USD să servească drept depozit colateral, pentru garantarea împrumutului acordat de Finansbank Companiei Bayindir pe perioada 10 august 1999 - 16 august 2000.

Depozitul la termen a fost reînnoit lunar, pe întreaga perioadă a împrumutului acordat de Finansbank Companiei Bayindir cu scadența finală la data de16 august 2000.

Depozitul în valoare de 3.000.000 USD, constituit la Finansbank la data de 13 august 1999 și înregistrat în contul 1312 "Depozite la termen la bănci" cu nota contabilă nr.DY 27/SLIP nr.28409 din 13 august 1999 a fost transformat în depozit colateral, cu titlu de garanție pentru facilitatea de credit acordată de către această bancă Companiei Bayindir prin documentul semnat la data de 10 august 1999. Transformarea celor 3 plasamente ale BTR la FINANSBANK în depozite colaterale nu a fost evidențiată în contabilitate ca atare, respectiv în contul 1313 "Depozite colaterale la bănci" și în contul din afara bilanțului 901"Angajamente în favoarea altor bănci".

Înregistrările din evidența contabilă a BTR neconforme cu realitatea, s-au datorat faptului că angajații BTR din cadrul departamentelor funcționale (Direcția de arbitraj, trezorerie, back-office, contabilitate și control) nu au cunoscut destinația reală dată de conducerea băncii disponibilităților bănești plasate ca depozite la termen și reînnoite prin mesaje SWIFT de confirmare și tickete deal-uri (SLIP), deoarece conducerea nu a pus la dispoziția acestor departamente documentele de angajare față de Finansbank a acestor depozite.

În luna octombrie 2000, inculpații Tobur Mehmet Fahim, Tulgar Koray, președinte și, respectiv vicepreședinte ai BTR au prelungit integral plasamentele în valoare totală de 14mil. USD, care reprezentau garanții pentru facilitățile de credit acordate de Finansbank grupului Bayindir.

Astfel, inculpații au semnat la data de 27 octombrie 2000 un Titlu de Girare a Depozitului (vol. 2- fila 215), prin care se prelungeau plasamentele în valoare de 7mil. USD și respectiv 3 mil. USD create la Finansbank Olanda în baza Titlurilor de Girare a Depozitelor semnate la datele de 4 august 1999 și 10 august 1999 (vol.2- filele 160-162) de către inculpații Yurukoglu Levent Husein și Koncavar Murat.

Întrucît scadența celor 2 titluri de girare a depozitelor se împlinise la datele de 10 august 2000 și 16 august 2000, iar Bayindir nu rambursase creditele, Finansbank Olanda urma să treacă la executarea garanțiilor (depozite), girurile avînd caracter irevocabil și necondiționat.

La data de 25 octombrie 2000, aceeași inculpați au prelungit plasamentul în valoare de 4 mil. USD constituit la Finansbank Elveția în baza adresei angajament semnată la data de 4 februarie 1998 de către inculpații Yurukoglu Levent Husein și Dumitrescu Cristian.

În perioada 1999 - 2000, BTR a încheiat cu Esbank Ag Viena 7 contracte de girare pentru suma totală de 24.080.000 USD.

Astfel, în lunile august și septembrie 1999, inculpații Yurukoglu Levent Husein, Koncavar Murat, președinte și, respectiv vicepreședinte au încheiat 5 contracte de girare în valoare de 14.000.000 USD și 6.000.000 EUR. De la data semnării lor, contractele de girare semnate cu Esbank AC Viena au fost evidențiate în contabilitatea BTR în contul 1312 "Depozite la termen la bănci", cu prelungirea lunară a plasamentelor și încasarea lunară a dobînzilor, regăsindu-se lunar în soldul acestui cont din balanțele de verificare, aflate la

dosarul cauzei (vol. 2DUP - fila 72). La datele de 4 şi 5 mai 2000, inculpatii Yalcinaya Ç
Figen şi Dumitrescu Cristian, vicepreşedinţi ai BTR au încheiat cu Esbank 2 contracte
girare în valoare de 5 mil. USD (vol. 2 DUP- filele 180-183), prin care se garantau toate
datoriile prezente şi viitoare ce ar fi apărut ca urmare a împrumuturilor acordate de Esbank
Companiei Ba yindir prin contractele de credit încheiate. Contractele aveau acelaşi conţinut
şi aceeaşi formă ca şi contractele de girare anterioare încheiate cu Esbank.

De la data semnării, aceste acte juridice, au fost înregistrate în contabilitate în contul
1312 "Depozite la termen la bănci", cu prelungirea lunară a plasamentelor şi cu încasarea
lunară a dobînzilor, regăsindu-se lunar în soldul acestui cont pe balanţele de verificare aflate
la dosarul cauzei (vol. 2 DUP- fila 72).

Neevidenţierea acestor depozite colaterale conform naturii lor juridice reale s-a
datorat faptului că angajaţii Băncii Turco-Române S.A. din cadrul departamentelor
funcţionale (direcţia de arbitraj, trezorerie, back-office, contabilitate şi control) nu cunoşteau
destinaţia reală dată disponibilităţilor băneşti, plasate ca depozite la termen şi reînnoite lunar
prin mesaje SWIFT de confirmare şi tickete dealurs (SLIP), deoarece inculpaţii Yurukoglu
Levent Husein, Koncavar Murat , Yalcinaya Cetin Figen nu au pus la dispoziţia acest
departamente contractele de girare pe care le-au semnat. Cu privire la prelungirea
plasamentelor la Esbank raportul de expertiză contabilă a reţinut că (vol.2 DUP - la 80) la
data de 31 octombrie 2000, cele 7 contracte de girare în sumă de 19.000.000 USD şi
6.000.000 EUR figurau în soldul contului 1312 "Depozite la termen la bănci", ca, urmare a
reînnoirilor prin tichete dealuri (SLIP) şi a notelor contabile aferente prelungirilor acestor
depozite la termen (vol. 2-filele 222-235), BTR a efectuat prelungirea depozitelor aflate în
conturi la Esbank pînă la data scadenţei sau ulterior scadenţei împrumuturilor pe care
această bancă le acordase pentru Bayindir aspect rezultat şi din mesajul swift (vol. 2- fila
236-237) transmis în data de 13 noiembrie 2000 de Esbank. La data de 27 noiembrie 2000,
Esbank AC a transmis prin telefax o declaraţie privitoare la executarea depozitelor colaterale
ale BTR în sumă de 19 mil. USD şi 6 mil. EUR (vol. 2- filele 23'8-239), ca urmare a
nerambursării de către Bayindir a împrumuturilor scadente la 13.11.2000.

În perioada 28 decembrie 1999 - 31 ianuarie 2000, inculpaţii Yurukoglu Levent
Husein, Koncavar Murat, preşedinte şi respectiv vicepreşedinte ai BTR au încheiat cu
Banque Francaise De L'Orient 3 contracte fiduciare în valoare totală de 4 mil. USD.

Transferul sumelor care au făcut obiectul contractelor fiduciare s-a efectuat la
data semnării contractelor. Pentru derularea contractului semnat la data 28 decembrie 1999,
(vol. 2 - filele 140-140, BTR a transferat în contul său de valută deschis la Banque Francaise
suma de 10.000.000 USD pentru constituirea a 2 depozite la termen, plasamentele fiind
evidenţiate în contabilitatea BTR în contul 1312 "Depozite la termen la bănci". La scadenţă,
cele două depozite au fost prelungite cu SLIP nr.34293 şi Nota contabilă nr.DY 17 din 28
ianuarie 2000, pentru perioada 28 ianuarie 2000 - 28 februarie 2000, urmînd ca la această
valoare să funcţioneze ca depozite la termen, cu încasarea lunară a dobînzii de 12% pe an.
Ultima prelungire a celor două depozite la termen (în fapt, contracte fiduciare), în sumă totală
de 10.000.000 USD s-a făcut la data de 30 octombrie 2000, cu SLIP nr.45351 şi Nota
contabilă DY 10 din 30 octombrie 2000 (vol. 2 - filele 153-154), pentru perioada 30 octombrie
2000-30 noiembrie 2000, fiind înregistrat în contabilitatea Băncii Turco Române în contul
1312 "Depozite la termen la bănci", denaturîndu-se astfel conţinutul real al operaţiunii
efectuate.

Pentru cel de-al doilea contract fiduciar, semnat la data de 18 ianuarie 2000 (vol. 2 -
filele 145-146) BTR a transferat în aceeaşi zi în contul de valută deschis la Banque
Francaise suma de 15.000.000 USD. Plasamentul a fost înregistrat cu Nota contabilă nr.DY
4 şi SLIP 33752 din 18 ianuarie 2000 în cont 1312 "Depozite la termen la bănci" funcţionînd
ca depozit la termen cu încasarea lunară a dobînzii de 12% pe an (vol. 2 - filele 151-152).
Ultima prelungire a depozitului la termen (în fapt, contract fiduciar) în sumă de 15.000.000
USD s-a realizat la data de 25 octombrie 2000, cu SLIP nr.45261 şi Nota contabilă DY 10 din
26 octombrie 2000 (vol. 2 - filele 157-158), pe perioada 25 octombrie 2000 - 27 noiembrie
2000 şi s-a înregistrat în contabilitate în contul 1312 "Depozite la termen la bănci",
denaturîndu-se astfel conţinutul real al operaţiunii efectua te.

Pentru cel de-al treilea contract fiduciar, semnat la data de 31 ianuarie 2000 (vol. 2 - filele 148-149), BTR a transferat la data de 1 februarie 2000, în contul său de valută deschis la Banque Francaise suma de  5.000.000 USD. Plasamentul a fost înregistrat cu Nota contabilă DY 17 şi SLIP 34391 din 1 februarie 2000 în evidenţa contabilă în contul 1312 "Depozite la termen la bănci", funcţionînd ca depozit la termen cu încasarea lunară a dobînzii de 12% (vol. 2- filele 151-152). Ulterior s-a procedat la prelungirea depozitului la termen (în fapt, contract fiduciar) la data de 10 octombrie 2000 cu SLIP nr.45108 şi Nota contabilă DY 8/23 octombrie 2000 (vol. 2- fila 157-158), pe perioada 10 octombrie 2000 - 10 noiembrie 2000 şi s-a înregistrat în contabilitatea BTR în contul 1312 "Depozite la termen la bănci", denaturîndu-se astfel conţinutul real al operaţiunii efectuate.

Înregistrările efectuate în evidenţele contabile ale BTR prin care s-a denaturat conţinutul operaţiunilor derulate cu Banque Francaise de l'Orient s-au datorat faptului că angajaţii BTR din cadrul departamentelor funcţionale (direcţia de arbitraj, trezorerie, back-office, contabilitate şi control) nu au cunoscut destinaţia dată disponibilităţilor băneşti plasate ca depozite la termen şi reînnoite lunar prin mesaje SWIFT de confirmare şi prin tickete deal-uri (SLIP), deoarece inculpaţii Yurukoglu Levent Husein şi Koncavar Murat nu au pus la dispoziţia acestor departamente cele 3 contracte fiduciare încheiate cu Banque Francaise.

Prin adresa nr.3024 din 10 aprilie 2001(vol.3 - fila 290), BTR a învederat că Bayindir nu a solicitat în scris BTR a garanta creditele mai sus-menţionate şi nu a depus documentaţia necesară în vederea garantării acestor credite.

Garantarea firmei Bayindir nu a fost discutată în şedinţele Consiliului de Administraţie al BTR  şi, în consecinţă, nici aprobată.

Atribuţiile şi responsabilităţile Consiliului de Administraţie, precum şi procedurile sale de lucru şi durata mandatului membrilor acestuia sînt stabilite în Statutul băncii. S-a mai precizat că din procesele-verbale ale Consiliului de Administraţie nu rezultă ca BTR să fi fost informată în mod formal despre creditele luate de firma turcă şi garantarea lor de către BTR, în vederea înregistrării în contabilitate şi nici despre faptul că firma turcă nu şi-a restituit creditele.

De asemenea, prin adresa nr.226/15 ianuarie 2002, BTR (vol.3 - filele 1-2) a precizat că nu exista nici o reglementare internă a  sa  care să permită constituirea de depozite colaterale la bănci din străinătate.

Raportările privind plasamentele BTR la alte bănci din străinătate se făceau către Banca Naţională A României zilnic, prin modem, iar la finele lunii se transmiteau eletric.
Garantarea de către o societate bancară a executării obligaţiilor unei persoane fizice sau juridice ce le avea faţă de partenerii săi de afaceri în baza unor contracte comerciale se realiza prin emiterea unei scrisori de garanţie bancară, înregistrarea în contabilitate a depozitelor mai sus menţionate se realizează de către Departamentul Back-Office din subordinea Direcţiei Trezorerie ".

Din pct. 2 intitulat "Modalitatea de lucru" din "Indicaţiile de lucru" privind aplicarea "Normelor de funcţionare" a pieţei monetare interbancare în lei" nr. 4/1995  BNR,ale Băncii Turco-Române S.A - Direcţia Trezorerie (vol. 3 - filele 7-8) rezultă că:
Tranzacţiile încheiate între BTR şi alte bănci comerciale în piaţa monetară interbancară prin acceptarea de către ambele părţi a valorii depozitului, perioadei şi nivelului de dobîndă se înscriu în slip dealul de către dealer, care le semnează.
Slip dealul în original se remite back-office -ului, pentru a fi transmisă reconfirmarea prin S. W.I.F. T. sau telex, după caz.
Reconfirmarea cuprinde, cel puţin, următoarele elemente:  contrapartida; data încheierii tranzacţiei; suma tranzacţionată; timpul tranzacţiei; rata dobînzii; corespondenţii părţilor; modalitatea de încheiere a tranzacţiei.

O copie a slip deal-ului se transmite în ziua încheierii tranzacţiei la Serviciul resurse şi plasamente, în vederea întocmirii ordinului de plată în cazul depozitelor plasate sau luării în evidenţă pentru urmărirea intrării sumelor în cazul depozitelor atrase.

Operarea în contabilitatea internă a băncii se asigură de către back-office, autorizarea înregistrărilor efectuîndu-se la sfîrşitul zilei de către salariatul direcţiei cu astfel de atribuţii.

13

Slip deal-ul, împreună cu 1 exemplar din nota contabilă și reconfirmarea depozitu
păstrează în arhiva Direcției Trezorerie. Exemplarul 2 din nota contabilă atașat la jur
operațiunilor zilei se transmite Direcției de contabilitate și control.
Ambele exemplare din nota contabilă se vizează de directorul adjunct al Direcției Trezorer
Situația de fapt expusă mai sus este dovedită și de declarațiile martorilor audiați atât
faza de urmărire penală cât și pe parcursul cercetării judecătorești.

Martorul Gheorghe Bogdan(vol.I DUP - fila 588 și  vol.III f 108 dosar) a arătat că a
îndeplinit la BTR funcția de  arbitrajist (în perioada 1996-1998 ), șef  serviciu (iunie 1998 -
mai 1999 ) și  director al Departamentului Arbitraj (iunie 1999 - octombrie 2000), iar dintre
atribuțiile aferente acestei ultime funcții erau și acelea de administrare a fondurilor în lei și în
valută puse la dispoziție. În privința plasamentelor în valută către Banque Francaise de
l'Orient, Demirbank, Es Bank Ac Viena, Finansbank N. V. Olanda, Dinamic Bank  a preciza
că erau ordonate în mod exclusiv de conducerea băncii și anume inculpații Tobur, Tulgar ș
Yurukoglu.

Aceștia îi transmiteau atît sumele, cît și termenele și băncile unde urmau a fi plasate
depozitele, iar el la rândul său  transmitea aceste informații subalternilor pentru a efectua
operațiunile. La  scadența fiecărui depozit cerea președintelui să-i comunice instrucțiunile
referitoare la depozite privind prelungirea lor. Unele depozite au fost făcute începînd cu 1998,
fiind doar prelungite termenele, iar altele au fost constituite pe parcurs. După încheierea
tranzacțiilor ticketele acestora erau preluate de back office și prelucrate în contabilitate.  Tot
timpul a cunoscut faptul că banii erau plasați în depozite la termen și nu a fost inform  de
către conducere că acestea au fost transformate în depozite colaterale. Niciodată nu a văzut
contracte de garanție încheia se între BTR și băncile sus-menționate, în tickete nu se
menționa niciodată existența unor astfel de înțelegeri. Departamentul său avea doar atribuții
de a executa dispozițiile de plasament și nu avea atribuția de a  da avize consultative.
Dispozițiile pe care le primea priveau ce plasamente trebuiau făcute și la ce bănci, fără a i se
aduce la cunoștință natura depozitului.

Martora Osman Sena (vol1DUP - filele 589-591  și vol. III dosar f 106) a fost angajată
în perioada 1994-2001 în cadrul BTR la Trezorerie iar, în perioada 1998-2001, a îndeplinit
funcția de șef serviciu la Departamentul de operațiuni avînd ca îndatoriri de serviciu
prelucrarea tuturor tranzacțiilor făcute de arbitrajiști, ceea ce însemna atît înregistrarea în
contabilitate, cît și efectuarea de mesaje în vederea confirmărilor cu băncile. Și aceasta a
arătat că nu a deținut nici un fel de informații privind eventuale  depozite colaterale, ace  
lucru aflându-l la sfîrșitul anului 2000.

Cu privire la documentele aferente acestor plasamente și care i-au fost prezentate de
către poliție, a declarat că sînt cele din BTR, iar notele contabile au fost înregistrate de
departamentul Back-Office, la modul de plasamente la termen, cu avizul său, însă d   la
care s-au făcut plasamentele respective, precum și documentele pe baza cărora s-au făcut
înregistrările contabile, nu dovedesc că ar fi fost vorba de alt fel de tranzacții și nu cele de
tipul depozite la termen,necunoscând faptul că aceste depozite la termen sînt de fapt
depozite colaterale. Toate înregistrările efectuate de Back-Office erau preluate automat în
sistemul informatic și transmise Departamentului Contabilitate.

Dobre Carmen, audiată fiind (vol.IDUP - fila 594 și vol. III dosar f137) a arătat că din
luna decembrie 1997 și pînă în luna iulie 2002, a îndeplinit succesiv funcțiile de economist și
de șef serviciu contabilitate în centrala băncii. Atributiile sale de serviciu vizau întocmirea
situațiilor raportate la Banca Națională A României, situații lunare cerute de conducerea
băncii ori de firma de credit. De asemenea, s-a ocupat de calculul activului, a indicatorilor de
performanță ai băncii, de situația patrimoniului și de situațiile financiare trimestriale și
bilanțul contabil  și a precizat că   înregistrările contabile se efectuau de către fiecare
departament în parte, pînă la nivel de balanțe lunare, situațiile de venituri, și cheltuieli pentru
fiecare zi, datorită sistemului contabil al băncii care permitea acest lucru, la sfîrșitul fiecărei
zile, erau prelucrate și se scotea balanța de verificare centralizată.
Referitor la plasamentele financiare făcute de BTR la bănci din străinătate, a declarat că
evidența contabilă se întocmea la Departamentul Back-Office din cadrul Trezoreriei, în baza
documentelor întocmite în acest sens. Șef al acestui departament era Osman Sena. De

14

fiecare dată în perioada 1998-2000 în contabilitate aceste plasamente apăreau înregistrate ca şi depozite la termen, cu termene de maxim o lună. De asemenea, apărea şi dobânda încasată în baza depozitelor. Aceste date le prelua şi le includea în balanţele de verificare, iar ulterior în bilanţ. Bilanţul era semnat de către directorul direcţiei contabilitate şi preşedintele băncii ori în lipsă, de un vicepreşedinte.

Nu a cunoscut faptul că s-au făcut plasamente financiare la bănci străine, pe care ulterior conducerea băncii le-a transformat în garanţii şi credite acorda te firmei Bayindir din Turcia şi nu a văzut nici un contract fiduciar ori un alt fel de contract încheiat de conducerea băncii cu băncii din străinătate.

Toate raportările către B.N.R. şi bilanţurile contabile au fost întocmite de bună credinţă, în baza datelor existente în contabilitate şi a documentelor ce reflectau operaţiunile efectuate. La compartimentul de contabilitate nu au ajuns aceste contracte fiduciare.

Cioflan Aristide, ( vol.1 DUP filele 598-599 şi vol. III dosar f139) în luna ianuarie 1994 a avut calitatea de director al Direcţiei de contabilitate, iar în luna februarie 2001 a fost numit în Consiliul de Administraţie al băncii, avînd ca atribuţii de serviciu organizarea contabilităţii, ţinerea la zi a evidenţei contabile, întocmirea de raportări către conducerea băncii şi către BNR, întocmirea contului de profit şi pierderi şi a bilanţului contabil pe care îl semna alături de preşedinţia băncii. Acesta a arătat că sistemul contabil al băncii permitea ca, la compartimentul Back office de la Dealing să se efectueze înregistrări contabile primare direct pe calculator.

Zilnic, directorul de la Trezorerie primea un exemplar al balanţei operaţiunilor pentru vizare, după care o trimitea la compartimentul contabilitate. Tot acesta aviza şi trimiterea swift-urilor de către angajaţii din subordinea sa. Director de Back-Office în perioada 1999-2000 a fost Vinulescu Constantin, iar la Dealing era Bogdan Gheorghe. Martorul a arătat că nu a cunoscut faptul că şefii Băncii Turco-Române S.A. au transformat unele depozite la termen în depozite colaterale şi că au semnat cu diverse bănci contracte fiduciare, în baza cărora banii au fost folosiţi pentru creditarea şi pentru garantarea grupului de firme Bayindir din Turcia.

Aceste contracte nu au fost depuse în bancă, iar semnatarii lor nu au încunoştiinţat banca despre semnarea şi încheierea lor. Avînd în vedere faptul că nu a cunoscut existenţa contractelor şi nu le-a deţinut, toate înregistrările contabile şi raportările la BNR le-a întocmit în baza datelor deţinute, iar plasamentele valutare au fost înregistrate ca depozite la termen. Toate aceste raportări şi bilanţul contabil pe anul 2000 le-a semnat cu bună-credinţă. Din 8.11.2000 de cînd a aflat de la B.N.R. despre aceste operaţiuni, a înregistrat aceste operaţiuni astfel: sumele de la Dinamic Bank le-a înregistrat ca debite în sarcina grupului Bayindir şi a constituit pentru ele comisioane nedeductibile fiscal, neexistînd relaţii comerciale cu ele. Sumele de la Banque Francaise de l'orient nu erau scadente decît în ianuarie 2001 şi le-a înregistrat ca şi depozite colaterale, fără a se constitui provizioane, iar la scadenţa lor, le-a considerat credite în sarcina firmei Bayindir şi a constituit provizioane deductibile fiscal. Martorul a mai arătat că au rămas nerecuperaţi aproximativ 54 mil.USD plus dobînzi. Înregistrările au fost reflectate în bilanţul contabil pe anul 2000, iar martorul a mai relevat că din momentul anunţului privind incapacitatea de plată a BTR lumea a intrat în panică şi atât băncile care aveau depozite cât şi clienţii au început să formuleze cereri de retragere. Datoriile băncii au fost achitate într-un procent de 92% rămânând datorii de 45 mil. dolari. Martorul a mai arătat că grupul Bayindir a achitat mare parte din datoriile sale, însă chiar dacă ar fi achitat şi restul de 45 mil. lei rezultatul ar fi fost acelaşi întrucât imaginea băncii a avut mult de suferit şi nu s-ar mai fi putut desfăşura o activitate normală. Faptul că s-a practicat o dobândă de 12% în condiţiile în care pe piaţă se întâlnea o dobândă de 6% la depozite de acest gen şi deoarece aceasta a fost încasată la timp a făcut ca deturnarea acestor depozite de la destinaţia lor, reflectată în contabilitate, să nu fie percepută ca atare şi totodată să nu existe suspiciuni cu privire la natura acestor depozite.

Şerban Anca (vol1 DUP- filele 602-603 şi vol.III dosar f 164) a lucrat ca arbitrajist (în perioada mai 1997 - Iulie 1999) şi şef de departament în perioada iulie1999 - ianuarie 2001). Ca arbitrajist, avea ca atribuţii primirea situaţiei fondurilor în lei şi valută de la Serviciul Trezorerie. În ceea ce priveşte fondurile în valută, lua legătura iniţial cu preşedintele băncii

Levent Yurukoglu şi apoi cu Muslu Arzu director de marketing, care indicau unde, cît şi
perioadă să se plaseze fondurile sau dacă trebuiau prelungite. În calitate de şi
departament, verifica modalitatea operaţiunilor, urmărea menţinerea raportului valută/lei
limitele stabilite de BNR, întocmea documentele pentru licitaţile de titluri de stat emise
Ministerul deFinante. Aproape toate fondurile erau canalizate către bănci turceşti, deoare
dobînda era foarte mare în raport cu cea oferită de băncile occidentale, aproape dublă.
Arbitrajul purta conversaţia prin Dealing cu banca ce le era indicată în urma încheierii
tranzacţiei în Back-Office se verifica corectitudinea întocmirii tichetului cu datele tranzacţie
prin comparare cu copia conversaţiei purtate intr bănci, prin intermediul Dealing-ului.Tichetul
era semnat de cel care îl întocmea, de oricare alt coleg şi apoi, în baza lui, se întocmea
mesajul swift de confirmare a depozitului, mesaj ce eratransmis la banca cu care se încheia
tranzactia.

De asemenea, acea bancă transmitea un mesaj swift de confirmare a depozitului, iar în
urma primirii acestui mesaj se întocmea nota contabilă şi se înregistra în contabilitate.
Mesajul swift de confirmare se oprea la linia 57, fără nici un fel de altă precizare, ceea ce
înseamnă depozit la termen.

Nu a ştiut că depozitele în valută erau depozite colaterale, nefiind informaţi de conducere sau
de altcineva de acest lucru. A aflat despre existenţa contractelor colaterale de la dl.director
Cinteză în noiembrie 2000, după izbucnirea scandalului.

În ceea ce priveşte Dinamic Bank, confirmările de depozit erau trimise prin fax şi nu
prin swift, iar arbitrajul a întocmit tichete în baza acestor confirmări şi nu prin conversaţie
directă.

Nu am văzut nici un contract de depozit colateral pînă în decembrie 2000, cînd
Esbank Viena sau Banque Francaise de l'orient de Geneve au transmis prin fax o copie a
unui contract semnat de preşedintele Tobur şi vicepreşedintele Koray Tulgar.

În urma cererii exprese din partea BNR, Banque Francaise de l'orient de Geneve sau
Esbank Viena au transmis pe fax un contract de depozit colateral semnat de preşedintele
Tobur şi vicepreşedintele Koray Tulgar. Finansbank Olanda şi Finansbank Elveţia nu au
răspuns, ci doar au înapoiat depozitele.

Faptul că băncile la care existau unele depozite au executat contractele de colateral l-
a aflat de la oficialii BNR în decembrie 2000.

Martorul Serban Remus Luigi (vol.1 DUP - fila 604 şi vol. III dosar f162), arbitrajist în
perioada noiembrie 1999 - ianuarie 2001, avînd atribuţii referitoare la încheierea de tranzacţii
de atragere/plasare disponibilităţi în lei şi valută în sistem interbancar pe piaţa internă şi
externă, a precizat că nu cunoştea faptul că aceste depozite ar fi fost colaterale la credite,
aspect despre care a aflat aproximativ în luna decembrie 2000, în urma unor informări
asupra rezultatelor controalelor efectuate de BNR în condiţiile dificultăţilor financiare ale F_R
înregistrate la sfîrşitul anului 2000. Toate depozitele pe care le-a operat erau libere de sarcini
şi nu puteau fi folosite ca garanţii. Cu toate că ceea ce făcea departamentul său constituia un
acord de principiu, acesta nu era suficient pentru efectuarea operaţiunilor respective,
perfectarea efectivă fiind făcută de către structurile de back oficce şi aprobată în contabilitate
de alte structuri. Martorul a mai precizat că orice persoană din conducerea băncii putea da
dispoziţii sau indicaţii cu privire la plasamentele în valută.

Fiind audiat în faza de urmărire penală, martorul Cinteză Nicolae, director al Direcţiei
Supraveghere din Banca Naţională a României, a declarat (vol1 DUP- filele 652-657) că
primul semnal privind imposibilitatea recuperării sumelor în valută plasate în străinătate a fost
dat la începutul lunii noiembrie 2000 de către fostul preşedinte al BTR Levent Yurukoglu şi
fostul vicepreşedinte Cristian Dumitrescu, care s-au prezentat la BNR la viceguvernatorul
coordonator al Direcţiei Supraveghere Bogza Mihai şi i-au comunicat că s-ar părea că există
probleme cu depozitele respective.

În aceaşi seară (6-7 noiembrie) Levent Yurukoglu a fost chemat la BNR şi, în
prezenţa Guvernatorului BNR Emil Ghizari, a viceguvernatorului Bogza Mihai şi a lui, a
declarat că nu sînt nici un fel de probleme cu depozitele respective. Din documentele
prezentate echipei de control, nu a rezultat că depozitele respective sînt angajate în favoarea
unui terţ şi nici raportările făcute de BTR nu au evidenţiat caracterul de colateral al

16

declarat că nu sînt nici un fel de probleme cu depozitele respective. Din documentele prezentate echipei de control, nu a rezultat că depozitele respective sînt angajate în favoarea unui terț și nici raportările făcute de BTR nu au evidențiat caracterul de colateral al depozitelor respective și nici angajamentul Băncii față de Grupul Bayindir. Contractele în baza cărora depozitele respective au fost angajate nu au fost găsite la sediul BTR.

Martora Muslu Arzu Ayse director de marketing, responsabilă cu relațiile cu clienții turci a declarat (vol.I - filele 584-585) că a cunoscut din bilanțul băncii despre faptul că sînt făcute anumite depozite, dar nu a știut că acestea reprezintă garanții pentru firma turcă Bayindir. Aceeași situație de fapt a descris și martorul Bodîrcă Cristian, arbitrajist care a aflat că, de fapt, ele ar constitui garanții pentru o terță parte numai după ce au venit în control reprezentanții BNR.

Și martorii Vinulescu Constantin,  vol. III dosar f 244, Vâlvoi Mocanu Constantin vol.III- f 335 dosar au susținut de asemenea că nu au avut cunoștință de natura reală a cestor depozite știind că este vorba de depozite la termen libere de orice sarcini.

În faza de urmărire penală inc. MURAT KONCAVAR (vol.4 - filele 62- 65): a arătat că în perioada febr. 1997 - 4 mai 2000 a lucrat ca vicepreședinte în cadrul BTR și răspundea de departamentele de marketing, relații cu publicul, investigații, credite. În legătură cu plasamentele făcute de BTR în scopul de a garanta creditele obținute de aceste bănci de către compania Bayindir a susținut că acest fapt era posibil în conformitate cu art.1 pct A din Regulamentul de funcționare al BTR. Totodată a arătat că nu își amintește nimic în legătură cu contractele angajament prin care, în perioada 23.06.1999 - 26.07.1999, în numele BTR în calitate de vicepreședinte și Yurucoglu Levent în calitate de președinte, au transmis la Demirbank - Sucursala Malta și Demirbank - Sucursala Bahrain acceptul irevocabil și necondiționat ca plasamentele BTR la această bancă să constituie garanție pentru facilitățile de credit acordate Grupului Bayindir.

A mai arătat și faptul că în perioada în care sumele sus menționate au fost plasate la Demirbank, BTR avea suficiente disponibilități bancare, întrucât clienții interni ai băncii nu solicitaseră credite. În legătură cu evidențierea în contabilitate a acestor plasamente drept depozite la termen în loc de depozite colaterale, a precizat că nu cunoaște nimic întrucât departamentele de contabilitate și trezorerie intrau în subordinea altor vicepreședinți. Cu ocazia Adunărilor Generale ale Acționarilor se discuta despre dobânzile încasate la plasamentele de la băncile din străinătate, însă nu se făcea referire la adevărata lor natură juridică, respectiv depozite colaterale. Inculpatul a mai arătat că nu își aduce aminte dacă a semnat vreun contract prin care BTR să își fi luat angajamentul să garanteze necondiționat credite ale grupului Bayindir.

Dumitrescu Cristian, audiat fiind de organele de urmărire penală a arătat că în încheierea contractelor cu alte bănci Banca Turco-Română trebuia să fie reprezentată de către două persoane din conducerea băncii, existînd în acest sens o listă autorizată a semnăturilor cu persoanele care puteau angaja banca, între care figuram și el. În momentul în care a semnat contractul din 04.02.1998 a făcut-o la sugestia lui Yurukoglu Levent Husein împreună cu alte documente, bazindu-se pe încrederea reciprocă care exista de mulți ani între ei, la acea dată necunoscând adevăratul obiect al contractului.

Aceleași precizări le-a făcut și cu privire la necunoașterea de către el a obiectului contractului în valoare de 6 milioane de dolari pe care l-a semnat la data de 2 septembrie 1999 la sugestia aceluiași Yurukoglu Levent Husein, care la acea dată îndeplinea funcția de președinte al Băncii Turco-Române.  La datele de 4 și 5 mai 2000 la cererea președintelui interimar la acea dată al Băncii Turco-Române, respectiv Yalcinkaya Cetin Figen a semnat două contracte care aveau ca obiect garantarea a două credite în valoare de 4 milioane și respectiv 1 milion dolari acordate grupului Bayindir de către Esbank AG Viena. Precizează că inițial s-a opus semnării acestor contracte, însă a cedat datorită atît insistențelor lui Yalcinkaya Cetin Figen, cît și asigurărilor acestuia că finanțarea va fi pe o perioadă foarte scurtă, maxim o lună și că nu vor fi nici un fel de probleme pentru Banca Turco-Română. De asemenea Yalcinkaya Cetin Figen i-a spus că Cortuk Kamuran avea nevoie urgentă de aceste sume de bani, pentru o perioadă foarte scurtă.

Nu a văzut nici o cerere de constituire a depozitelor colaterale în valoare de 4 și 1 milion

17

dolari formulată de către grupul Bayindir şi nici nu i-a cerut lui Yalcinkaya Cetin Figen s
arate un asemenea document, e avind incredere în spusele sale.

Până la sfirşitul lunii noiembrie 2000 toate sumele din depozitele colaterale ce au făc
obiectul celor patru contracte sus-menţionate semnate de el au fost restituite de băncile di
străinătate ca urmare a achitării creditelor de către grupul Bayindir. În consecinţă, prin
semnarea de către el a acestor contracte, nu a cauzat nici un prejudiciu. Inculpatul a mai
arătat că cele patru contracte nu au fost supuse aprobării Consiliului de Administraţie şi nu a
cunoscut nimic în legătură cu încheierea altor contracte de depozite colaterale de către
Banca Turco-Română cu alte bănci din străinătate în favoarea grupului Bayindir.

Potrivit   Legii  bancare  nr.58/1998, cu modificările şi completările ulterioare şi a
Regulamentului nr.3 din 23 decembrie 1997 privind operaţiunile valutare, băncile din
România constituite în formă juridică ca societăţi comerciale pe acţiuni, pot deschide şi
menţine conturi în valută în străinătate şi pot efectua operaţiuni valutare, în nume şi cont
propriu. În tem. art. 8 din Legea  nr.58/1998, băncilor li se permite să desfăşoare, în limita
autorizaţiei acordate, o serie de activităţi, printre care emiterea de garanţii şi asumarea de
angajamente; transferuri de fonduri; acceptarea de depozite.

Potrivit prevederilor cuprinse în  Cap.IV art.17 din Regulamentul nr.3/1997 privind
operaţiunile valutare, băncile, implicit şi Banca Turco-Română S.A. pot deschide şi menţine
conturi în valută şi străinătate pentru activitatea desfăşurată în baza autorizaţiei de
funcţionare, fără obligaţia de obţinere prealabilă a autorizaţiei Băncii Naţionale a României. În
conturile în valută deschise la bănci în străinătate, rezidentii inclusiv Banca Turco-Română
S.A. pot efectua operaţiuni valutare, aşa cum sint definite la pct.l.17 din Regulamentul nr.3:
"încasările, plăţile, compensările, transferurile, creditările, precum şi orice alte tranzactii
exprimate în valute şi care se pot efectua prin transfer bancar, în numerar, cu instrumente de
plată sau prin alte modalităţi de plată agreate sau acceptate de bănci". Deasemenea băncile
din România au posibilitatea legală de a garanta sau credita agenţi economici privaţi români
sau străini, pentru obţinerea de către aceştia a unor credite din străinătate, dar cu
respectarea strictă a prevederilor legale şi a normelor proprii de lucru. Banca Turco-Română
S.A. nu avea elaborate şi aprobate norme proprii de lucru care să permită constituirea de
depozite colaterale în valuta la  bănci in străinătate. Cu toate acestea ignorându-se
dispozitiile legale Banca Turco-Română S.A.a fost angajată peste limita de expunere
prevăzuta de normele Băncii Naţionale A României, prin semnarea unor contracte de
garantare/finanţare a unor credite acordate de/prin bănci corespondente externe cu capita
turcesc din Olanda, Viena, Geneva, Malta, Bahrein şi Cipru de Nord, grupului Bayindir,
acţionarul majoritar al băncii. Prin nedepunerea contractelor respective la Banca Turco-
Română S.A. şi prin emiterea documentelor de plasare/prelungire a depozitelor respective ca
depozite la termen şi  nu ca depozite colaterale sau credit, s-a urmărit ascunderea
conţinutului economic real al operaţiunilor respective, întocmindu-se în acest fel situaţii
financiare (bilanţ, raportări către B.N.R.) nereale. Pentru angajamentele de creditare sau
finanţare date în favoarea grupului Bayindir nu au fost constituite garanţii şi nici nu au fost
percepute comisioane. Ca urmare a nerambursării creditelor respective de către grupul
Bayindir şi imposibilităţii executării unor garanţii (datorită inexistenţei lor), depozitele plasate
la Dinamic Bank Of Cyprus, în sumă de 19,9 milioane USD şi 8,8 milioane EURO au fost
executate de banca respectivă.

Conform raportului BNR, BTR a calculat şi transmis BNR un nivel nereal al fondurilor
proprii iar prin aceasta a denaturat conţinutul raportărilor de prudenţă bancară încălcându-se
dispoziţiile art. 69 L 58/1998. la data de 31.12.2000 toţi indicatorii de prudenţă bancară
calculaţi în funcţie de fondurile proprii ale băncii s-au situat în afara limitelor reglementate,
devenind irelevanţi.  Ca urmare a crizei de lichidităţi BTR nu a fost în măsură să-şi
îndeplinească obligaţiile stabilite de către BNR prin Regulamentul nr 4/1998, respectiv
constituirea rezervei minime obligatorii la nivelul prevăzut. Tot ca urmare a aceleiaşi crize
BTR a înregistrat situaţii în care instrumentele de debit nu au fost onorate integral, în termen
de cel puţin 30 zile de la data debitării contului clientului. S-a concluzionat că BTR se
încadrează la data de 31.01.2001 în prevederile art. 2(1) lit."a" L63/1998 privind procedura

18

P21

alimentului bancar „ o bancă este considerată insolvabilă dacă.........nu a onorat integral creanțe certe, lichide și exigibile în termen de cel puțin 30 zile".

La data de 31 ianuarie 2001, patrimoniul net negativ pe care îl înregistra Banca Turco-Română demonstra starea de insolvabilitate a acesteia. Constituirea la cele 4 bănci străine de plasamente sub formă de depozite colaterale în sumă de 122.800.000 echivalent în USD, pentru garantarea împrumuturilor acordate de aceste bănci, companiei Bayindir Insaat Turizm Ticaret, a condus la confruntarea băncii cu scăderea dramatică a lichidităților băncii, situînd banca în poziția de împrumutat net pe piața monetară interbancară, situație ce nu a mai putut fi gestionată de conducerea băncii. Ca urmare a acestei constituiri a depozitelor colaterale la băncile din străinătate, pentru garantarea facilităților de credit acorda te grupului Bayindir de băncile respective, pe seama împrumuturilor făcute de pe piața interbancară internă și utilizarea disponibilităților existente în conturile și depozitele clienților băncii, Banca Turco-Română a intrat într-o lipsă acută de lichidități care, în cele din urmă a dus la falimentul acesteia.

Consecințele relevante mai sus s-au datorat după cum am mai precizat îndeplinirii în mod defectuos a atribuțiilor de serviciu de către inculpații Yurukoglu Levent Husein, Koncavar Murat, Yalcinkaya Cetin Figen și Dumitrescu Cristian.

Astfel, inculpații Yurukoglu Levent Husein în calitate de președinte al BTR, Koncavar Murat, vicepreședinte BTR, Yalcinkaya Cetin Figen, vicepreședinte și Dumitrescu Cristian, vicepreședinte au angajat banca peste limita de expunere prevăzută de normele Băncii Naționale A României, prin semnarea unor contracte de garantare/finanțare a unor credite acordate de bănci străine grupului Bayindir, iar prin aceasta, ca urmare a modului în care s-au derulat contractele, așa cum am relevat mai sus, au produs nu numai o pagubă însemnată patrimoniului părții civile, ci și o tulburare însemnată a bunului mers a acesteia, finalizându-se cu intrarea acesteia în procedura de faliment.

În drept, fapta inculpaților întrunește conținutul constitutiv al infracțiunii de abuz în serviciu contra intereselor publice în formă calificată prevăzută și pedepsită de art. 248 raportat la art. 248¹ C.p. Aceștia au săvârșit fapta cu intenție prevăzând și acceptând că prin aceasta vor cauza o tulburare însemnată bunului mers al instituției, al cărei funcționari sunt, și totodată o pagubă patrimoniului acesteia. Inculpații au săvârșit fapta împreună devenind incidente dispozițiile art. 75 lit. „a" C.p., fapta fiind săvârșită în circumstanța agravantă prevăzută de acest text.

În ceea ce-l privește pe inculpatul Kamuran Cortuk instanța a reținut în sarcina sa săvârșirea infracțiunii de instigare la infracțiunea de abuz în serviciu contra intereselor publice, în formă calificată prevăzută de, de art. 25 C.p. rap la art 248 C.p. comb cu art. 248¹ C.p., cu aplicarea art. 75 lit. „a" C.p. acesta, în calitate de membru al Consiliului de Administrație al BTR i-a determinat pe ceilalți inculpați să-și îndeplinească în mod defectuos atribuțiile de serviciu ( așa cum am descris mai sus ). Astfel, inculpatul a avut această calitate de membru al Consiliului în virtutea faptului că era președinte majoritar al companiei Bayindir, acționar majoritar al BTR, determinând pe ceilalți inculpați cu puterea de decizie referitor la stabilirea naturii fiecărui depozit constituit, să-i ajute compania, al cărei reprezentant era, să obțină facilități de creditare de la bănci străine prin garantarea acestor împrumuturi. Inculpatul Kamuran Cortuk în calitatea sa de administrator al Băncii Turco-Române și de președinte al Consiliului de Administrație al Companiei Bayindir Holding - acționar majoritar al BTR, a impus conducerii executive a acestei bănci, din perioada 1998 - aprilie 2000, angajarea disponibilităților bănești aflate în conturile băncii ca depozite colaterale la bănci din străinătate, pentru finanțarea și garantarea împrumuturilor contractate de Bayindir.

Din cele relevante mai sus rele fără dubiu că, procedeul utilizat de Levent Yurukoglu - președinte și Murat Koncavar - vicepreședinte, semnatarii documentelor de constituire a depozitelor colaterale utilizate pentru garantarea creditelor contractate de Bayindir, a fost cunoscut și monitorizat de Kamuran Cortuk, fiind astfel conceput pentru a se eluda prevederile din Legea bancară nr.58/1998, respectiv articolele nr.29-31, 44 și 45. Toate plasamentele de natura celor descrise mai sus s-au făcut în interesul exclusiv al acestei companii, care în cele din urmă, neachitându-și datoriile la scadență, a determinat colapsul

19

P22

financiar al BTR ce a dus la falimentul acesteia.

Faţă de împrejurările în care au fost săvârşite faptele, gradul de pericol social acestora, urmarea imediată şi celelalte criterii de individualizare al pedepsei statuate de 72 C.p., instanţa se va orienta spre pedeapsa închisorii în cuantum diferit pentru inculpaţ Kamuran Coriuk şi inculpatul Dumitrescu Cristian, având în vedere în ceea ce-l priveşte pr primul contribuţia sa decisivă la determinarea celorlalţi inculpaţi de a săvârşi faptele de abuz în serviciu, iar în ceea ce-l priveşte pe cel de-al doilea faptul că era minoritar în consiliul de administraţie, puterea de decizie mai mare aparţinea celorlalţi inculpaţi, fapt care nu-l absolvă însă pe acesta de vinovăţie întrucât nu a fost forţat în nici un fel să participe la punerea în practică a deciziei de a schimba natura juridică a anumitor plasamente, iar în situaţia în care ar fi intrat în dezacord cu ceilalţi membrii nu l-a împiedicat nimeni să nu semneze contractele angajament şi să semnaleze caracterul ilicit al acestor operaţiuni.

Din modalitatea de săvârşire a procedurilor relevate mai sus a reieşit că, pentru a se ascunde natura acestor plasamente s-a procedat la înregistrarea lor în contabilitate în contul de depozite la termen ( cont 1312 )şi nicidecum în contul specific depozitelor garanţii ( cont 1313 şi 901 ). Aceste înregistrări au fost efectuate de către diverşi funcţionari din cadru departamentelor de contabilitate, trezorerie, back office, funcţionari, care aşa cum a reieşit din probatoriul administrat în cauză au cunoscut adevărata natură a acestor depozite pe care le înregistrau, întrucât datele le erau prezentate de către conducerea BTR, nu au avut nici un moment acces la documentaţia aferentă acestor depozite şi au aflat adevărul dea la momentul constatării incapacităţii de plată a BTR. Deşi în art.57 din Legea nr.58/1998 (Legea bancară) se arată că: "Băncile trebuie să ţină permanent evidenţa contabilă în concordanţă cu prevederile legii contabilităţii şi ale reglementărilor specifice date în aplicarea acesteia şi să întocmească situaţii financiare adecvate, pentru a reflecta în mod corespunzător operaţiunile şi condiţia lor financiară. ", plasamentele sub formă de depozite la bănci străine, în sumă de 108.000.000 USD şi 14.800.000 EUR, la data de 31.10.2000 erau evidenţiate în contabilitatea Băncii Turco-Române S.A în contul 1312 "Depozite la termen la bănci", deşi acestea reprezentau, în fapt, depozite colaterale constituite de Banca Turco-Română la bănci din străinătate, pentru garantarea facilităţilor de credit acordate de acestea grupului Bayindir.

Cu privire la acest aspect, în concluziile raportului de expertiză contabilă (vol. 2DUP - filele 97-100) se precizează că în conformitate cu Planul de conturi şi Normele metodologice de utilizare a acestuia, aprobat de Ministerul Finanţelor şi Banca Naţională a României i... data de 1 august 1997 sub nr.1418, respectiv nr.344, operaţiunile respective trebuiau reflectate în contul 1313 "Depozite Colaterale la Bănci", iar angajamentul Băncii Turco-Române în favoarea băncilor străine, asumat în numele grupului Bayindir, trebuia înregistrat în conturi în afara bilanţului, respectiv în contul 901 "angajamente în favoarea altor bănci".

Modul defectuos de evidenţiere în contabilitate a depozitelor colaterale plasate la cele patru bănci din străinătate de către Banca Turco-Română, s-a datorat faptului că angajaţii băncii din cadrul departamentelor funcţionale (direcţia de arbitraj, trezorerie, back-office, contabilitate şi control) nu cunoşteau destinaţia reală a disponibilităţilor băneşti plasate ca depozite la termen şi lunar reînnoite prin mesaje SWIFT de confirmare şi tickete dealuri (SLIP), deoarece persoanele din conducere care au semnat documentele de constituire a depozitelor colaterale nu au pus la dispoziţia acestor departamente documentele respective.

Raportul de expertiză contabilă reţine şi că, prin neevidenţierea în contabilitate şi în rapoartele întocmite de Banca Turco-Română a garanţiilor acordate grupului Bayindir, s-au încălcat dispoziţiile art.2 din Legea contabilităţii nr.82/1991, art.I din Ordinul ministrului finanţelor şi al guvernatorului Băncii Naţionale a României nr.1418/344/1997, art.19 din Planul de conturi pentru societăţi bancare, aprobat prin Ordinul Ministrului Finanţelor şi al Guvernatorului Băncii Naţionale a României nr.1418/344/1997 şi art.54, 56-57, 69 alin.l.lit.a,c,d şi f din Legea bancară nr.58/1998.

Actele materiale de determinare a acestor funcţionari de a efectua înregistrări inexacte în contabilitatea BTR au fost efectuate la intervale de timp dar în realizarea aceleiaşi rezoluţii infracţionale şi întrunesc elementele constitutive ale infracţiunii de participaţie Improprie la fals intelectual prevăzută de art. 31(2) C.p. rap. la art. 43 din legea din Legea 82/1991

20

P23

republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal. La data întocmirii actului de sesizare infracţiunea descrisă mai sus era reglementată de art. 40 din legea 82/1991, ulterior republicată dându-se textelor o nouă renumerotare, iar prevederile art. 40 din forma iniţială a legii se regăsesc întrutotul, fără vreo deosebire în textul art. 43. Întrucât nu s-a dat decât o nouă renumerotare nu sunt incidente dispoziţiile art. 13 C.p., nefiind în prezenţa unei legi mai favorabile.

Instanţa, faţă de considerentele expuse mai sus va reţine vinovăţia inculpaţilor Kamuran Cortuk, Koncavar Murat, Yurukoglu Levent Husein, Yalcinkaya Cetin Figen, Dumitrescu Cristian, Ercelik Mustafa Kemal, Tobur Mehmet Fahim, Tulgar Koray în ceea ce priveşte săvârşirea cu intenţie a infracţiunii prevăzută  de art. 31(2) C.p. rap. la art. 43 din legea din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal. Aceştia, în calitate de preşedinţi, vicepreşedinţi, membrii ai Consiliului de Administraţie au determinat angajaţii BTR să efectueze înregistrări inexacte în contabilitate ce au avut drept consecinţă denaturarea elementelor de activ şi pasiv ce se reflectă în bilanţ.

În ceea ce-l priveşte pe inculpatul Yurukoglu Levent Husein  instanţa va reţine în sarcina sa şi săvârşirea infracţiunii prevăzută de art. 271 pct. 2 din Legea 31/1990 republicată cu aplicarea art. 41(2) Cod penal. Acesta, în calitate de preşedinte executiv al BTR şi preşedinte al Consiliului de Administraţie la datele de 19.03.1999 şi 30.03.2000, în realizarea aceleiaşi rezoluţii infracţionale a prezentat, cu rea credinţă, acţionarilor, cu ocazia Adunării Generale a Asociaţilor, bilanţuri contabile inexacte, cu scopul de a ascunde situaţia reală a BTR. Art. 271 pct. 2 reia integral textul art. 265 pct. 2 al legii 31/1990, în forma sa iniţială, în această formă fiind redat în conţinutul actului de sesizare, instanţa nefăcând aplicaţia art. 13 C.p. pentru aceleaşi considerente expuse mai sus referitor la legea 82/1991.

La individualizarea pedepselor ce urmează a fi aplicate inculpaţilor instanţa va avea în vedere dispoziţiile art. 72 C.p., gradul de pericol social al faptei fiind ridicat, urmările imediate fiind deosebit de grave şi cu implicaţii majore nu numai în privinţa părţii civile ci şi asupra clienţilor prejudiciaţi ai acesteia, rezonanţa faptelor săvârşite fiind de natură a zdruncina încrederea în stabilitatea sistemului bancar. De asemenea instanţa va reţine atitudinea nesinceră a inculpaţilor care nu şi-au recunoscut faptele, au îngreunat desfăşurarea cercetărilor prin diverse cereri nejustificate referitoare la modalitatea de citare în condiţiile în care erau la curent cu învinuirile ce li se aduc, pasivitatea lor faţă prejudiciul suferit de către partea civilă.

_Latura Civila:_ din concluziile raportului de expertiză contabilă (vol. 2 DUP filele90-97) Instanţa reţine că Banca Turco Română a plasat şi a menţinut în conturile în valută deschise la băncile străine menţionate, începând cu data de 3 februarie 1998 pînă la data de 1 februarie 2001, suma totală de 108.000.000 USD şi 14.800.000 EUR.

În perioada 13 noiembrie 2000 - 3 aprilie 2001, a fost recuperată suma totală de 62.166.666,67 USD şi 6.000.000 EUR (echivalent în dolari de 5.080.000) ca urmare a rambursării către băncile străine a unei părţi din creditele acordate grupului Bayindir sau prin încasarea directă a unor sume de la persoane fizice şi juridice care aparţin grupului Bayindir. Sumele recuperate şi sumele rămase de recuperare din depozitele plasate la aceste banci, sînt prezentate în anexa nr. 63 (vol. 2 DUP fila 241). Prejudiciul cauzat BTR  la data de 31 decembrie 2002 ca urmare a nerecuperării în totalitate a sumelor plasate la bănci în străinătate pentru garantarea facilităţilor de credit acordate companiei Bayindir Insaat Turizm Ticaret ve Sanayi AS este în valoare totală de 59.421.921,04 USD plasamente nerecuperate şi dobânda aferentă şi11.326.199,99 EUR plasamente nerecuperate şi dobânda aferentă pînă la data de 31.03.2003.

În consecinţă, faţă de considerentele ce preced instanţa în temeiul art. 25 Cod penal raportat la art. 248-248^1 Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal  va condamna pe inculpatul Kamuran Cortuk la 13 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal va condamna pe acelaşi inculpat la 6 ani închisoare.

21

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul va execut
pedeapsa cea mai grea de 13 ani închisoare.

Va aplica dispoziţiile art. 71-64 lit."c" Cod penal.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată,
raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal
va condamna pe inculpatul Ercelik Mustafa Kemal la 5 ani închisoare.

Va aplica dispoziţiile art. 71-64 lit."c" Cod penal.

În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal va condamna pe
inculpatul Koncavar Murat la 11 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată,
raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal
va condamna pe acelaşi inculpat la 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul va executa
pedeapsa cea mai grea de 11 ani închisoare.

Va aplica dispoziţiile art. 71-64 lit."c" Cod penal.

În temeiul art. 88 Cod penal va deduce din durata pedepsei durata arestării preventive
a inculpatului din perioada 02.06.2003-29.07.2003.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată,
raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal
va condamna pe inculpatul Tobur Mehmet Fahim la 5 ani închisoare.

Va aplica dispoziţiile art. 71-64 lit."c" Cod penal.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată,
raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal
condamnă pe inculpatul Tulgar Koray la 5 ani închisoare.

Aplică dispoziţiile art. 71-64 lit."c" Cod penal

În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal condamnă
pe inculpatul Yalcinkaya Celin Figen la 11 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată,
raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal
va condamna pe acelaşi inculpat la 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul va executa
pedeapsa cea mai grea de 11 ani închisoare.

Va aplica dispoziţiile art. 71-64 lit."c" Cod penal.

În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal condamnă
pe inculpatul Yurukoglu Levent Husein la 11 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată,
raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal
condamnă pe acelaşi inculpat la 5 ani închisoare.

În temeiul art. 271 pct. 2 Legea 31/1990 republicată cu aplicarea art. 41(2) Cod penal
va condamna pe acelaşi inculpat la o pedeaosă de 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul va executa
pedeapsa cea mai grea de 11 ani închisoare.

Va aplica dispoziţiile art. 71-64 lit."c" Cod penal. Astfel, instanţa va interzice inculpaţilor
dreptul de a mai ocupa o funcţie, de a mai exercita o profesie sau de a desfăşura o activitate
de natura aceleia de care s-au folosit pentru săvârşirea infracţiunii, întrucât au devenit astfel
nedemni de a exercita asemenea activităţi, pedeapsă ce se va executa după executarea
pedepsei închisorii. Întrucât acestor inculpaţi nu le sunt recunoscute drepturi electorale pe
teritoriul statului român şi nici nu pot ocupa funcţii care implică exerciţiul autorităţii publice
sau funcţii elective publice, drepturi recunoscute şi garantate constituţional doar cetăţenilor
români, instanţa nu va face aplicarea dispoziţiilor art. 64 lit. „a,b" C.p.

În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal va
condamna pe inculpatul Dumitrescu Cristian la 9 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată,
raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal
va condamna pe acelaşi inculpat la 5 ani închisoare.

22

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul va executa pedeapsa cea mai grea de 9 ani închisoare.

Va aplica dispozițiile art. 71-64 lit."a" teza a doua, „b" și „c" Cod penal. Va face aplicarea art. 71- 64 lit. a teza finală și lit. b C.p., în considerarea jurisprudenței C.E.D.O. cu referire la cauzele Sabău și Parcălab împotriva României și Hirst împotriva Marii Britanii, în aceste cauze Curtea apreciind că aplicarea pedepselei accesorii nu poate atrage de drept interzicerea dreptului de a vota și a dreptului de a ocupa o funcție sau de a exercita o profesie de natura celei de care inculpatul s-a folosit la săvârșirea infracțiunii. În ceea ce privește pedeapsa accesorie, instanța reține că natura faptei săvârșite, persistența infracțională, ansamblul circumstanțelor personale ale inculpatului duc la concluzia existenței unei nedemnități în exercitarea drepturilor de natură electorală prevăzute de art.64 lit.a teza II-a și lit.b din Codul penal, respectiv dreptul de a fi ales în autoritățile publice sau în funcții elective publice și dreptul de a ocupa o funcție implicând exercițiul autorității de stat, motiv pentru care exercițiul acestora va fi interzis pe perioada executării pedepsei.

Nu va interzice inculpatului dreptul de a alege ci doar pe cel de a fi ales, având în vedere exigențele CEDO, reflectate în Hotărârea din 6 octombrie 2005, în cauza Hirst împotriva Regatului Unit al Marii Britanii și Irlandei de Nord, în care Curtea a apreciat, păstrând linia stabilită prin decizia Sabou și Pîrcălab împotriva României, că nu se impune interzicerea ope legis a drepturilor electorale, aceasta trebuind să fie dispusă în funcție de natura faptei sau de gravitatea deosebită a acesteia.

Or, fapta care a făcut obiectul prezentei cauze nu are conotație electorală sau vreo gravitate specială, astfel că instanța apreciază că nu se impune interzicerea dreptului de a alege.

Dreptul de a fi ales se impune însă a fi interzis deoarece din penitenciar condamnatul nu și-ar putea îndeplini funcțiile elective și nici nu ar putea reprezenta un model de conduită pentru cetățeni.

De asemenea va interzice inculpatului dreptul de a mai ocupa o funcție, de a mai exercita o profesie sau de a desfășura o activitate de natura aceleia de care s-au folosit pentru săvârșirea infracțiunii, întrucât a devenit astfel nedemn de a exercita asemenea activități, pedeapsă ce se va executa după executarea pedepsei închisorii.

În temeiul art. 353 Cod procedură penală va menține măsura sechestrului asigurătoriu dispusă prin ordonanța nr. 00069/10.05.2001 de către organul de cercetare penală referitor la bunurile inculpaților. Această măsură se justifică în continuare întrucât prejudiciul suferit de către partea civilă este important, inculpații nu au depus nici un minim de diligențe pentru al acoperi măcar în parte, partea civilă având astfel o garanție a faptului că măcar parte din acest prejudiciu va putea fi acoperit.

În temeiul art. 14 raportat la art. 346 Cod procedură penală și art. 998-999 Cod civil va obliga inculpații către partea civilă Banca Turco Română prin lichidator Fondul De Garantare A Depozitelor În Sistemul Bancar la plata a 59.421.921,04 USD și 11.326.199,99 EUR, în echivalent lei la data plății, cu dobânda legală calculată de la data de 31.03.2003 până la data achitării integrale a debitului.

În temeiul art. 191(2) Cod procedură penală va obliga inculpații la plata a 4000 lei cheltuieli judiciare către stat, câte 500 lei fiecare.

PENTRU ACESTE MOTIVE,
ÎN NUMELE LEGII
HOTĂRĂȘTE

1. În temeiul art. 25 Cod penal raportat la art. 248-2481 Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal condamnă pe inculpatul **KAMURAN CORTUK** domiciliat în Samsun – Tekkekoy, com Cirakman, Sabit Sagiroglu nr. 5, Turcia citat și prin afișare la ușa instanței și la sediul C.L.S.1 la 13 ani închisoare.

23

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, rapo la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal condamn pe același inculpat la 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul execută pedeaps cea mai grea de (3 ani închisoare.)

Aplică dispozițiile art. 71-64 lit."c" Cod penal.

II. În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal condamnă pe inculpatul ERCELIK MUSTAFA KEMAL, domiciliat în Turcia, Eskisehir Merkez Mutallip CD NO 331, citat și prin afișare la ușa instanței și la sediul C.L.S.1 la 5 ani închisoare.

Aplică dispozițiile art. 71-64 lit."c" Cod penal.

III. În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal condamnă pe inculpatul KONCAVAR MURAT, domiciliat în București, Bd.Libertății, nr. 10, bl. 114, sc. 1, et. 3, ap. 8, sector 4, citat și prin afișare la ușa instanței și la sediul C.L.S.1 la 11 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal condamnă pe același inculpat la 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul execută pedeapsa cea mai grea de (11 ani închisoare.)

Aplică dispozițiile art. 71-64 lit."c" Cod penal.

În temeiul art. 88 Cod penal deduce din durata pedepsei durata arestării preventive a inculpatului din perioada 02.06.2002-29.07.2003.

IV. În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal condamnă pe inculpatul TOBUR MEHMET FAHIM, domiciliat în Turcia, Istanbul, Atakoy, 5 Kisim E I6 AD 19, cita și prin afișare la ușa instanței și la sediul C.L.S.1 la 5 ani închisoare.

Aplică dispozițiile art. 71-64 lit."c" Cod penal.

V. În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal condamnă pe inculpatul TULGAR KORAY, domiciliat în Turcia, Istanbul, Nispetiye CAD Kerem 1 Ap.No.24 – A D:11 citat și prin afișare la ușa instanței și la sediul C.L.S.1 la 5 ani închisoare.

Aplică dispozițiile art. 71-64 lit."c" Cod penal

VI. În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal condamnă pe inculpatul YALCINKAYA CETIN FIGEN, domiciliat în Ankara, Turcia, Mutlu Mah. Zabita Bloklari 127 Sokak, No 12, Akdere și Istanbul, Turcia, Igrip Sokak apt. No 25/21 Fenerbahce, Kadikoy citat și prin afișare la ușa instanței și la sediul C.L.S.1 la 11 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal condamnă pe același inculpat la 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul execută pedeapsa cea mai grea de 11 ani închisoare.

Aplică dispozițiile art. 71-64 lit."c" Cod penal.

VII. În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal condamnă pe inculpatul YURUKOGLU LEVENT HUSEIN, domiciliat în Istanbul, Turcia, 4 Levent, Otoyolcular Sitesi, blok nr. 10 B, sc. D, apt. 5 citat și prin afișare la ușa instanței și la sediul C.L.S.1; la 11 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal și art. 75(1) lit."a" Cod penal condamnă pe același inculpat la 5 ani închisoare.

În temeiul art. 271 Legea 31/1990 republicată cu aplicarea art. 41(2) Cod penal condamnă pe același inculpat la o pedeasă de 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul execută pedeapsa cea mai grea de 11 ani închisoare.

Aplică dispozițiile art. 71-64 lit."c" Cod penal.

24

P2

VIII. În temeiul art. 248-248¹ Cod penal, cu aplicarea art. 75(1) lit."a" Cod penal condamnă pe inculpatul DUMITRESCU CRISTIAN, domiciliat în Bucureşti, str.Ţintaşului, nr.3, sector 1 la 8 ani închisoare.

În temeiul art. 31(2) Cod penal raportat la art. 43 din Legea 82/1991 republicată, raportat la art. 289 Cod penal, cu aplicarea art. 41(2) Cod penal şi art. 75(1) lit."a" Cod penal condamnă pe acelaşi inculpat la 5 ani închisoare.

În temeiul art. 33 lit."a" raportat la art. 34 lit."b" Cod penal inculpatul execută pedeapsa cea mai grea de 9 ani închisoare.

Aplică dispoziţiile art. 71-64 lit."a" teza a doua, „b" şi „c" Cod penal.

În temeiul art. 353 Cod procedură penală menţine măsura sechestrului asigurătoriu dispusă prin ordonanţa nr. 00069/10.05.2001 de către organul de cercetare penală referitor la bunurile inculpaţilor.

În temeiul art. 14 raportat la art. 346 Cod procedură penală şi art. 998-999 Cod civil obligă inculpaţii către partea civilă BANCA TURCO ROMÂNĂ prin lichidator FONDUL DE GARANTARE A DEPOZITELOR ÎN SISTEMUL BANCAR, cu sediul Bucureşti în Aleea Negru Vodă, nr. 4-6, sector 3, la plata a 59.421.921,04 USD şi 11.326.199,99 EUR,în echivalent lei la data plăţii, cu dobânda legală calculată de la data de 31.03.2003 până la data achitării integrale a debitului.

În temeiul art. 191(2) Cod procedură penală obligă inculpaţii la plata a 4000 lei cheltuieli judiciare către stat, câte 500 lei fiecare în CONT IBAN: RO59TREZ7035032XXX005229 COD FISCAL 434063307 DESCHIS LA TREZORERIA SECTOR 3,  BENEFICIAR JUDECĂTORIA SECTOR 1

Cu apel în 10 zile de la pronunţare pentru inculpatul Dumitrescu Cristian şi procuror şi de la comunicare pentru ceilalţi inculpaţi.

Pronunţată în şedinţa publică din data de 19.04.2007.

PREŞEDINTE                                                    GREFIER

Red./dact.b.ş./12 ex/28.05.2007

P28